THE ATLANTA & WEST POINT RAILROAD CO. *v.* NEWTON.

1. On the trial of an action against a railroad company for damages from a homicide caused by alleged negligent running of its train, the admission of sayings, after the homicide, of one alleged to have been the engineer of the train, over the objection that he was not shown to have been a servant of the company, and the submission to the jury to find whether he was the engineer or not, was not error. A different question would have been presented by an objection that the statement of the engineer made after the transaction had ended, was inadmissible. But under the evidence the testimony objected to is immaterial; it appearing that the defendant was negligent in running its passenger-train at a high rate of speed within the city of LaGrange and over public crossings, and in not checking its speed so as to stop in time should any person or thing be crossing the track. The company may defend by showing that the injury was done with the consent of the deceased, or that he could have avoided it by the exercise of ordinary care, or (in mitigation of damages) that he contributed to it.

2. The issue being as to the conduct of the deceased at the time of the homicide, it was not admissible to show that his character was that of a prudent and cautious man.

3. The evidence showing that the deceased had been a farmer since arriving at years of maturity, and had never followed any other vocation, it was proper to prove his mental and physical capacity in order to show his ability to earn money as a farmer; but it was not admissible for witnesses to give their opinions as to the value of his services in occupations in which he had never engaged.

4. In using life tables as a basis for calculation of the value of the life of the deceased, the gross value when ascertained must be reduced to its present value to find the sum to be paid to the plaintiff, his widow. If the expectancy of her husband's life be twelve years, the verdict should be for a sum not larger than would be exhausted at the end of that time by expending each year a sum equal to his net earnings, the homicide having occurred before the passage of the statute forbidding any deduction for his expenses.

5. Instructions submitting to the jury whether the homicide was the result of an unavoidable accident, and whether the engineer might rightfully have presumed that the deceased would not attempt to cross the track, would have been inapplicable to the facts.

(a) The charge that generally "positive testimony is rather to be believed than negative testimony" is not erroneous, though the transposition of the word "rather" is inaccurate.

(b) Grounds for a new trial not insisted on, not considered.

May 9, 1890.

Damages.    Negligence.    Railroads.    Evidence. Charge of court.    Before Judge Harris.    Troup superior court.    April term, 1889.

On June 13, 1885, Mrs. Newton sued the railroad company for $15,000 damages for the homicide of her husband.    On the trial the evidence was conflicting, but tended to show the following facts:    Newton was sixty-three years old.    About four o'clock in the afternoon on May 29, 1885, he was driving his horse and buggy on Hines street, a public street in LaGrange, eastward towards the railroad track, to which the street gradually ascended from a branch about ninety yards below, and crossed it; this being a public crossing. About thirty yards before reaching the branch was a mill on the edge of the street, which was noisily grinding.    The day was stormy and damp, the wind blowing from the southeast, and rain was threatening, with some thunder and lightning.    The track was therefore some-

what wet and slick, and was down grade towards the
crossing in the direction from which the train was com-
ing.  Newton was on his way to the house of his kins-
man who lived on the other side of the railroad, and
was familiar with the crossing.  The street as it ascended
to the track from the branch was quite narrow, but a
horse and buggy might be turned around on it, with
some possible risk of falling into a ditch on the side.
The defendant's south-bound passenger-train, having
five coaches, was arriving at LaGrange station on about
schedule time.  As it entered the city limits, its speed
was reduced and the whistle was blown several times.
There were three crossings before reaching Hines street,
and the whistle was sounded at each, and the bell had
begun to ring quite a long distance before the train
reached Hines street, and continued to ring until after
the train stopped.  From that street at the railroad
crossing, looking up the track, an engine could be seen
as it came around the curve when it was at least 350
yards away, and persons on the engine could easily see
any one approaching the crossing as Newton was.  He
was seen by the fireman for at least that distance, and
the train was then running at a speed of from fifteen
to eighteen miles an hour.  As the engine rounded the
curve, the fireman lost sight of Newton; and the
engineer, who was on the other side of the engine, saw
him about fifteen or twenty yards from the track driving
towards it.  When the engine was about 139 yards
from the crossing, the engineer saw that Newton was
trying to cross the track and was urging his horse, but
the animal stopped on the track.  If it had pulled
straight ahead, the buggy would have passed safely over
and there would have been no casualty; but it turned its
head and saw the approaching engine, became frightened
and unruly, and in spite of Newton's efforts to drive it
across, turned suddenly aside and started to run down

the track in front of the train. Either this threw Newton backwards out of the buggy, or just then the buggy was struck by the engine. Newton was struck and knocked upward by the engine, and almost instantly killed. The horse escaped, carrying harness and part of the buggy, but fell down the embankment. When the engineer saw the horse stop on the track and Newton strike it with the reins, the train was still moving fifteen to eighteen miles per hour. He blew the danger signal, reversed the engine, applied brakes and stopped the train as soon as possible; but when it came to a stand, the rear end of the last coach was several yards beyond the crossing, and Newton was lying four or five feet back of the last coach. From the crossing the defendant's depot is 550 yards. There was testimony that Newton was warned as he passed the mill above mentioned, by the engineer there, named Miller, that the train was coming and he could not cross; and that he did not reply to this, but drove rapidly on. From the testimony of witnesses introduced by both sides it was shown that Newton was a prudent, intelligent, economical and thoroughly moral man; and they testified also as to the value of his services in money, what he could probably make and did make, etc. The plaintiff's witnesses estimated that he could make from $400 to $700 or more annually, and the defendant's witnesses estimated about half those amounts. He was a farmer, ran five plows and made a comfortable support for himself, his wife and four children. There was testimony showing that on the side of the railroad approached by him were some trees which might have aided to obstruct his view of the train as he drove up the hill to the track, but whether they really did so is doubtful. There was testimony for plaintiff that a man, supposed to be the engineer from his appearance, came back to where Newton was lying dead after the train stopped

and made certain statements to the conductor about the killing. The engineer himself, the conductor and other witnesses testified positively that the engineer did not do so, but was told as he started to leave his engine that the man was dead and nothing could be done, and so did not go back. They also testified that the postal clerk (not an employee of defendant) had on blue overalls, and may have been the person referred to as speaking to the conductor; but one witness for the plaintiff testified that the man not only had on blue overalls, but was also smutty and greasy.

The jury found for plaintiff $9,600. The defendant moved for a new trial on the following grounds:

(1-4) Verdict contrary to law and evidence.

(5-6) The court erred in allowing Turner, a witness for the plaintiff, to testify as follows: "A person whom I took to be the engineer from his garb, who had on overalls, was telling the conductor how the thing occurred. He stated to him that when they rounded the curve up there and came in sight of the crossing, he saw this man approaching the railroad or driving on it, I don't recollect which; and that they were sufficient distance from him to have got across without there being any danger from the train; and that he had driven across but just as he got across his horse stopped and began to back; at that time they were so near him that they could not stop the engine; that when he saw the horse backing he began to put on the brakes; he either said 'I put on the brakes' or 'I did all I could to stop the train.'" The objection was that it was not shown that the person making the statement was an employee of the defendant so that his sayings in and about the occurrence were competent evidence to bind it. The court submitted to the jury to find from the evidence whether the man in the overalls was an employee or not.

(7) The court allowed Turner to testify that Mr. Newton was an ordinarily prudent man in every way, so far as witness knew; that was the impression on his mind. The objection was that this was a conclusion and not relevant.

(8) The court erred in permitting a witness for the plaintiff to testify that Mr. Newton's character was that of a prudent and cautious man, over objection that this was a matter of opinion and irrelevant.

(9) Error in permitting plaintiff to ask a witness to state, knowing Mr. Newton as he did, his capacity and education and everything connected with him, what he could have made per annum; and in permitting the witness to testify: "I suppose he could have made $500 or $600 per year teaching school in a country school. As a mechanic, he could have made $500 or $600 per year. As a farmer, I think he would be worth $400 or $500 per year directing his own business." The objection was that this was the opinion of the witness, and was irrelevant.

(10) Error in admitting the testimony of the witness that Mr. Newton could have got the same salary as teachers at West Point, and that they commanded salaries of from $700 to $1,000 per year. The objection was that there was no testimony that Mr. Newton had at any time or would have ever become a teacher. One witness thought he taught some when a young man, but was not sure as to this.

(11) The court erred in permitting another witness to testify that Mr. Newton could, if he had gone as a skilled mechanic to the public, have been worth $600, and if he had directed his attention to teaching school, making money merchandising, keeping books or anything of that sort, or any sort of railroad work, if he was capable of doing it, he could have made $600. The objection was, that this was incompetent to the issue on trial.

(12) The court charged thus : "Having first found how much he would probably make each year, then look to the table of annuity to the number of years he would likely have lived ; then on one side of the page, if you find that it is twelve years or thirteen years, whatever you find, and opposite to that you will find the figure.    You take that figure and multiply what he would have made annually, and that will give you the present value of his life."    This was error, it not being the correct way of using the mortality and annuity tables.    The only correction of this charge made by the court was, that at the conclusion, when the jury had been told that they could retire, one of the plaintiff's counsel arose and stated to the court that he had made a mistake in charging in reference to the annuity tables, and that the way to find an annuity was to look for the number of years in the age table, take the figure opposite to it, and then multiply by that number as in the other case.    The court said to the jury, "That is correct, gentlemen," and further stated that the figure opposite the proved age was the figure to be used in determining the present value of the life of the deceased.    He did not further recharge the jury upon this subject nor ascertain if they had heard or understood what had been stated.

(13) The verdict is excessive.

(14, 17–21) The verdict is contrary to the charge of the court.

(15) Error in refusing to charge that if the jury believed from the evidence that the casualty by which Newton lost his life was the result of an unavoidable accident, then plaintiff was not entitled to recover, and the verdict should be for defendant.

(16) Error in refusing to charge: "The defendant's servants in charge of the engine and train of cars which struck said John T. Newton, had a right to assume that

he was rational and would exercise reasonable care and caution to keep himself out of danger, until they saw something in his conduct which was inconsistent with that presumption. And if you believe from the evidence that when the engineer in charge of the engine first came in sight of said John T. Newton, he was so far from the track of the railroad as to be free from danger of collision, then said engineer had a right to presume that he would remain at such safe distance, unless there was something in the circumstances calculated to rebut such presumption, or until said John T. Newton manifested a purpose to place himself in a dangerous position."

(22) The court erred in charging that the rule generally is, everything else being equal, that positive testimony is rather to be believed than negative testimony; when he should have charged that everything else being equal, positive testimony is to be believed in preference to negative testimony.

The motion was overruled, and defendant excepted.

Calhoun, King & Spalding, T. H. Whitaker and H. E. Ware, for plaintiff in error.

Longley & Pitman and P. H. Brewster, contra.

Simmons, Justice.

Mrs. Newton sued the railroad company for damages for the homicide of her husband. The jury returned a verdict in her favor, and the railroad company made a motion for a new trial, which was overruled by the court, and defendant excepted.

1. The fifth and sixth grounds of the motion complain of the admission in evidence of certain sayings, after the homicide, of a person alleged to have been the engineer on the train. This testimony was objected to on the ground that it was not shown that the person making the statement was an employee of the defendant so that his sayings in and about the occurrence

were competent evidence to bind it. The court submitted the question to the jury, for them to find whether the person who made the statement was the engineer or not. We do not think there was any error in admitting this testimony over the objection that was made to it at the time of the trial. If it was a doubtful question whether the person who made the statement was the engineer of the defendant, or of some other person, the court was right in submitting that question to the jury. If the objection had been that the statement of the engineer, made after the transaction had ended, was inadmissible, it would present a different question. We have read the evidence sent up in this record, and we deem it wholly immaterial whether this statement was made by the engineer of the defendant or not, or whether it was admissible or not, because the evidence clearly shows that the defendant was negligent in running its cars at a high rate of speed within the town of LaGrange, and over the public crossings, and in not "checking the speed thereof, so as to stop in time should any person or thing be crossing said track on said road" as required by section 708 of the code. It seems to us, from this evidence, that the only defence this company can make to this action is to show that the injury was done by the consent of the husband; or that he could have avoided it by the exercise of ordinary care; or, in mitigation of damages, that he contributed to the injury.

2. The eighth ground of the motion complains that the court permitted a witness for the plaintiff to testify that "Mr. Newton's character was that of a prudent and cautious man." We think the court erred in admitting this evidence for the purpose for which it seems to have been used by the plaintiff in the court below. One of the theories of the defendant was that the husband of the plaintiff could have avoided this

injury by the exercise of ordinary care and diligence at the time he was injured. The question at issue before the jury, therefore, was as to his conduct at that particular time, not as to whether he was a "prudent and cautious" man ordinarily or not. In the case of Morris v. Town of East Haven, 41 Conn. 254, the court said : "Every case has, of course, its peculiar circumstances, and these must be taken into consideration in determining whether or not in that particular case reasonable care was exercised. Hence, what would be reasonable care in one case, might fall far short of it in another, and consequently the question whether it was exercised in one case would throw no light upon the question whether it was exercised in another. . . . It might as well be proved that a party was negligent on a certain occasion by showing that he had been negligent on other occasions where other parties had been injured." In the case of Chase v. Railroad, 77 Me. 62, it was held : "In an action for personal injuries received by a collision at a railroad crossing, evidence will not be received to show the general character and habits of the traveler for carefulness, as bearing upon the question of due care on his part, though his injuries occasioned death before he could tell how the accident happened, and no one saw him at the time of the collision."

3. The ninth, tenth and eleventh grounds of the motion complain of the admissibility of the opinion of witnesses as to what the deceased could have made at certain occupations other than the one which he followed. One of the witnesses for the plaintiff testified that he supposed the deceased "could have made $500.00 or $600.00 per year teaching school in a country school ; as a mechanic, he could have made $500.00 or $600.00 per year ; as a farmer he would be worth $400.00 or $500.00 per year, directing his own busi-

ness"; and that "he could have got the same salary as teachers at West Point, and they commanded salaries of from $700.00 to $1,000.00 per year." Another witness testified that if the deceased "had gone as a skilled mechanic to the public, or if he had directed his attention to teaching school, making money merchandising, keeping books or anything of that sort, or any sort of railroad work he was capable of doing, he could have made $600.00." The evidence in the record shows that the deceased had been a farmer ever since he had arrived at years of maturity, and that he had never followed any other vocation. We therefore think that the opinion of witnesses as to what he could have made in other vocations was inadmissible. It is proper, in a case like this, to prove the capacity of the deceased, both mentally and physically, in order to show his ability to earn money in the vocation which he had selected and pursued through his whole life; but it is improper to allow witnesses to give their opinions as to the value of his services in occupations in which he had never engaged. In the case of Mansfield Coal & Coke Company v. McEnery, 36 Am. Dec. 664, Paxson, J., in discussing this question, said: "It was substituting for the ordinary, reasonable and probable incidents of life that which was speculative and unusual. . . . A laborer toiling in the mines may by chance pick up a nugget of gold worth a fortune. Industry, thrift and sagacity have enabled some poor men to become millionaires. These cases, however, are exceptional. They are only the possibilities of life. Looking at mere possibilities, this unfortunate muledriver, had he lived, might have become president of the United States. Yet to estimate the damages to his family upon the basis of a president's salary would be worse than a burlesque upon the administration of the law. Such a principle, carried to its logical conclusion

might bankrupt any person, firm or corporation en-
gaged in a business which involved the use of an ele-
ment of danger." We therefore think, under our
statute, that when a man is killed, and a suit is brought
to recover damages for his homicide, the amount of his
earnings, or the value of his life to his family, should
be based upon his probable earnings in the profession
or vocation which he had selected, or was permanently
pursuing at the time of his death. "The measure of
damages in an action by a wife for the homicide of her
husband, . . . depends solely upon the value of
the husband's life. In estimating such value by age,
habits, health, occupation, expectation of life, ability to
labor and to furnish care and attention to the family,
probable increase or diminution of that ability with
lapse of time, rate of wages, etc., the necessary per-
sonal expenses of the husband should be deducted, and
the balance, reduced to its present value, would be the
value of the life." *Central R. R.* v. *Rouse*, 77 *Ga.* 408.

Of course, if the deceased were a child, or a young
man who had not as yet selected a profession or voca-
tion, the rule would be somewhat different. That laid
down in *Davis* v. *Central R. R.*, 60 *Ga.* 329, and in
*W. & A. R. R.* v. *Young*, 81 *Ga.* 397, might be proper.

4. The twelfth ground of the motion complains that
the court erred in the rule laid down to the jury for
making their calculation upon the life tables, both in
the original charge, and as corrected at the suggestion
of plaintiff's counsel. It seems to us that this excep-
tion is well-taken. The rule as laid down by the court
at the suggestion of plaintiff's counsel, was the rule to
ascertain the gross amount of the value of the life;
when the court should have gone further, and instructed
the jury that, after finding this gross amount, they
should reduce it to its present value. The rule as given
would show what amount the deceased would have

earned, or been entitled to, if he had lived to the time the mortuary tables show his expectancy to be, and had waited for the money until he had earned it; but as the money recovered by the widow must be paid to her at once, this gross amount should be reduced to its present value. And for these reasons, and others which might be mentioned, we think the next ground (the thirteenth) of the motion, that the verdict is excessive, is well-founded. The amount of this verdict, if put at interest at 7 per cent., would give to this widow a sum greater per annum than any amount of earnings which her husband could have made if he had lived, even admitting the guessing and speculative opinions of the witnesses. The amount of the verdict, at 7 per cent. interest, would give her $672.00 per annum, and at the end of the twelve years, the expectancy of the life of her husband, she will have had this $672.00 annually for that whole length of time, and the amount of the verdict, $9,600.00 still in her hands. Whereas, the jury should have given her a sum that would be exhausted at the end of twelve years by expending each year an amount equal to the net annual earnings of the husband. Such would be the full value of his life. This death occurred before the act of 1887, which forbids any deduction for the husband's expenses. Of course the gross annual earnings will be the measure in cases falling under this act.

5. There was no error in refusing to give the charges set out in the fifteenth and sixteenth grounds of the motion, as they were not applicable to the facts of this case. Nor do we think there was any error in charging, as complained of in the twenty-second ground of the motion, "that the rule generally is, everything else being equal, that positive testimony is rather to be believed than negative testimony." The word "rather" seems to be in the wrong place in the sentence, but

doubtless the jury understood the charge that positive testimony was to be believed rather than negative testimony.

The other grounds of the motion were not insisted upon in the argument here.    *Judgment reversed.*