THE RICHMOND & DANVILLE RAILROAD CO. *v.* JOHNSTON.

The evidence warranted a finding for the plaintiff; and as the statute fixes the measure of damages at the full value of the life, the verdict was not excessive in amount.

May 2, 1892.  GOBER, Judge, presiding, by consent of parties, in place of SIMMONS, J., absent from providential cause.

Railroads.  Damages.  Negligence.  Before Judge VAN EPPS.  City court of Atlanta.  September term, 1891.

Mrs. Johnston sued the Richmond & Danville company, controlling and operating under lease the Georgia Pacific railway, for the homicide of her minor son. She obtained a verdict for $5,000.  Defendant moved for a new trial, and the motion was overruled.  The grounds of the motion were, that the verdict was excessive and showed undue bias and prejudice against defendant, was against the weight of the evidence and without evidence to support it, and was contrary to the principles of justice and equity.

The evidence for plaintiff was to this effect:  Rufus Johnston, her minor son, was killed by a train of defendant, about 10 o'clock in the morning, at a public crossing known as Bellwood crossing, which is about fifty yards beyond the city limits of Atlanta, and is much used.  Rufus Johnston approached the crossing driving mules attached to a wagon.  He waited for a train of the Western & Atlantic railroad, which was coming to-

wards the city, to pass. When it passed he started across. As he drove across the W. & A. track he looked towards a switch-engine below the crossing, and the train of defendant, coming around a curve from the direction of the city, struck the wagon and killed him. He was then upon the track of the Georgia Pacific railway. Defendant's train was running backwards from 18 to 30 miles an hour, the engine and tender being at the end of the train nearest to Johnston. No signal was given, except the blowing of the engine whistle at about 400 yards from the crossing. A curve in the track prevented the train being seen from the crossing at the point where this signal was given. The train did not check and keep checking speed before reaching the crossing, but increased the speed. It was possible to see from the crossing for 150 or 200 yards in the direction the train was approaching. If, when Johnston started across, he had looked in that direction, he could probably have seen the train in time to have stopped. He was driving a wagon with a sand bed on it, and the noise of his wagon, and his attention being drawn to the other engine mentioned, probably prevented his hearing the approach of the train which killed him, until just before he was struck. He was driving slowly as he approached the first track to where he stopped to permit the W. & A. train to pass. He was eighteen years old, a healthy, sober, good boy. Plaintiff has a husband and another son, an adult, who has to work for himself, and boards at plaintiff's house. Her husband assists in her support; he is 55 years old. Plaintiff is about 53, and lives on a small farm which she owns. Her oldest son does not contribute to her support. Her son who was killed did. She depended on his labor. If he made $1.50 he gave it to her, and when he was not driving the wagon he was at home working. He was her support. He had no regular

employment, but worked every day. At the time he was killed he made $3.00 a day driving the sand wagon and mules, which money was plaintiff's. She did not know exactly how much were his average earnings per day, but reckoned about $1.25 or $1.50. She is not able to work, but does all she can.

For the defendant, from the evidence of the conductor and engineer of the train in question, the following appears: Four hundred yards from the crossing the crossing signal was given by blowing the whistle. The conductor was on the engine. The engineer shut off steam, and the train moved along at the rate of 6 or 8 miles an hour until a point was reached from which the crossing could be seen, which was between 100 and 200 yards from the crossing. The fireman was looking out, and there is no trouble to see the track over the front of the tender when one is standing up. When the engine came in sight of the crossing no one was there, and the speed was increased to a rate of 12 to 18 miles an hour. Rufus Johnston was not seen by the engineer or conductor until the engine approached to about the city limits board, from 60 to 100 feet from the crossing. A high fence kept them from seeing him before. There is room enough between the Georgia Pacific track and the corner of the fence, for a wagon to have stopped. When they first saw him he drove right out from behind the fence, and the mules were trotting. He was not looking towards this train. The crossing is a public one and largely used. The high fence had been there for some months, and the conductor knew it was there. He testified: Just at the time Johnston came out from behind the fence I was looking; the fireman holloed at the same time, "Look out for the mules." Johnston was a little closer to the crossing than we were. We had no time to stop.

We did not see him in time to stop. By the time we saw him the engine hit him. We could have stopped easily if we had seen him when we came in sight. Did not check the train at all in approaching the crossing, after we saw it was clear. It was about the city limits before we saw him. I was talking to the engineer at the time, who was facing the engine backing, was standing with his hand on the throttle, and I was standing looking in his direction. The fireman holloed, "Look out for the mules"; we looked around, and about the time we saw him we struck him. The engine had an air-brake. If every effort were made to stop, the train could not have been stopped at that point under 100 yards. The train was beyond the crossing between 100 and 150 yards when stopped. It was not improper for witness to be on the engine.—The engineer testified: We got in about 150 or 175 or 100 feet of the crossing, and I saw a team come driving from behind the high fence and dash right up on the track in front of me, and did not give me any show to check up before I hit him. The team was going in a fast trot, nearly as fast as the train. He could have stopped very easily if his mules were walking. That high fence prevented his seeing us, but after he drove out from behind the fence, nothing at all to prevent. He was looking straight ahead of his team. The train had been ordered to go to Howell's and had about fifteen minutes to run two miles in, I think; it has been so long ago I have forgotten what time we had. Were running about 12 miles an hour when we struck the crossing, and at that rate of speed could have stopped in a little over 225 or 300 feet; at 20 miles an hour could have stopped in between 300 and 400 feet; and at 25 miles an hour in 500 feet. Johnston went 45 feet by the time the engine went 60 or 75 feet. He was going nearly as fast as the mules could trot. Do not know whether

they were loping or not.   It was down hill there.   No hill from the corner of the fence down there.   It is not true that I was talking to the conductor as we passed by that city limit post, facing each other; were talking at the whistle post, but do not think we were down there at the crossing at all; were not talking when the fireman said, "Look out for the mules"; and it was then that I saw him 60 or 75 feet; saw him about the time the fireman did.   Do not remember whether we were talking at that identical time or not.—The fireman testified that the conductor kept blowing the whistle until he struck the crossing; that he must have blown it twenty times, quite a number of times; that he kept blowing until after he had passed the crossing; that witness commenced ringing the bell when the conductor commenced blowing the whistle, and rang it until he got to the other side of the crossing; but it was admitted by defendant that the only signal that was given was given at the blow-post as above stated.—One of the train-hands testified:   When I first saw the man I got up and stayed by my brake, and about that time I felt the movement of the engine and "throw her ahead," and about that time my partner put on his brake; and if he had been driving slow he could have jumped off, I mean the driver.   I was on top, was putting on a hand-brake; before the brakes would work they struck him.   He was trotting.   There were three box-cars in the train.   After we passed the city limits the speed was increased a little, from 6 or 8 to 10 or 12 miles an hour. The other brakeman was on the second car from the engine, and was putting on brakes too.   Started to put on the brakes about 75 or 80 yards from the crossing, I suppose.   In addition to the air-brakes on the engine, we had a hand-brake which we put on the cars, three of them.   I felt the motion of the shut off about 75 or 80 yards from the crossing, and began to wind up hand-

brakes, as did other man.—Another witness testified: Johnston was driving at a slow trot over the crossing. When I saw him he had crossed over the W. & A. track; the next track was the Georgia Pacific; and witness holloed at him, but he paid no attention. He was looking right across the crossing. I suppose the noise of the engine or something kept him from hearing me. I looked around, and the Georgia Pacific engine was coming down the line at the rate of 15 or 20 miles an hour. I did not hear any bell. If Johnston had looked up the track it would not have done any good at that time. After he had struck the W. &. A. track, if he had looked up and down, may be he would have stopped. If he had looked up on the W. & A. track, whether he could have seen the train coming and could have stopped I do not know. He was in a slow trot when he struck the crossing, but when the train hit him, I could not see whether he was trotting or not. The reason he did not hear me was the noise of his wagon. Another witness testified: I saw the wagon coming across the track, then looked up the road and saw the engine coming, and made a motion and holloed to Johnston to stop, but he did not seem to hear or did not pay any attention. He was on the first track when I holloed. I heard the whistle blow before I saw the engine. It appeared to me like Johnston was looking in my direction, but I could not say whether he was or not. I was right below the crossing. The train was running about 25 miles an hour; could not say positively; first opinion was from 10 to 15 miles an hour, and I said that, I believe, at the coroner's jury. The mules were walking when I first saw them, and were about 15 feet from the place where they were struck; the engine was then just coming around the curve, about 200 yards away. Another witness testified that he had made some measurements at the point in question; that from

the corner of the fence to the track on which Johnston was killed was 53 feet and 3 inches, to the first track of the W. & A. 18 feet and 8 inches, and to the second track of the W. & A. 34 feet and 8 inches ; that a man after coming out from behind the fence could see up the track 150 yards, and the engineer could have seen the team as it came from behind the fence 150 yards; could have seen something on the crossing 150 yards before he hit it.

JACKSON & JACKSON, for plaintiff in error.

C. T. LADSON, *contra.*

GOBER, Judge.

The mother, the plaintiff below, brought suit for the death of her minor son. She alleges that he was killed by defendant's railroad train at a crossing near the city limits of Atlanta. The facts are set forth in the official report. She had a verdict below, and the defendant, on the refusal of a new trial, brings the case here.

It is not insisted from this evidence that the defendant below complied with the law. The train was run across the crossing at the rate of from twenty to thirty miles an hour, with the engine pushing some freight-cars in front. For the plaintiff's right to recover upon the facts presented, see 24 *Ga.* 79; 65 *Ga.* 120; 85 *Ga.* 525.

It is insisted that the verdict is contrary to law under the ruling in the *Clay* case, 84 *Ga.* 345. Since that case, the act of 1887 has been considered by this court in 86 *Ga.* 236. Measured by the rule there laid down, the mother, under the evidence in the record, had a right to recover, and, upon this point, the verdict is not contrary to law and the evidence.

Judge SIMMONS, in 85 *Ga.* 525, says: "The evidence clearly shows that the defendant was negligent in running its cars at a high rate of speed within the town of LaGrange, and over the public crossings, and in not checking the speed thereof so as to stop in time should

any person or thing be crossing said track on said road." The rule there laid down is, that the only defence the company could make in such case was, to show that the injury was done by the consent of the injured party, or that he could have avoided it by the exercise of ordinary care, or, in mitigation of damages, that he contributed to the injury.

Judge BLECKLEY, for the court, says in 79 *Ga.* p. 51: "Failure of the injured party in the use of ordinary care, by untimely stepping upon a railroad track at a public crossing, is no complete bar to the recovery of damages, unless, by the use of ordinary care, the consequences due to the negligence of the other party could have been avoided. . . And whether they could or not is a question for the jury." On page 53, same case, he says: "The precise thing which every man is bound to do before stepping upon a railroad track, is that which every prudent man would do under similar circumstances. If prudent men would look and listen, so must every one else, or take the consequences so far as the consequences might have been avoided by that means. The court cannot instruct the jury what a prudent man would do, for, in a legal contemplation, the jury know it better than the court."

We conclude that this case was a question for the jury. There is such a finding as the jury had a right to make from the evidence, under the law. There is no meritorious complaint of any error of law. The trial judge having approved the verdict, the      *Judgment is affirmed.*