## RAILWAY COMPANY *v*. HARRELL.

## Opinion delivered February 10, 1894.

1. *Evidence—Previous acts of negligence.*

In an action for the killing of a passenger on a street-car, caused by a collision between the street-car and a railroad train, evidence that the driver of the street-car had been guilty of other and previous acts of negligence at times and places near the time and place of the act complained of is inadmissible to prove his negligence on that particular occasion.

2. *Collision between railway train and street-car—Instruction.*

A charge that if the trainmen " discovered the street-car without a driver, or with a driver who was negligent in his duty, approaching and near the track and in danger of a collision with the railroad train, it became their duty to do all in their power to prevent such a collison " is not open to the objection that it required of the trainmen the highest degree of care toward one not a passenger ; since to do all that they could, in the case stated, to prevent a collision was but ordinary and reasonable care under the circumstances.

3. *Imputed negligence.*

Where a passenger upon a street-car is killed in a collision with a railroad train, the negligence of the driver of the street-car will not be imputed to the passenger.

4. *Collision—Negligence of trainmen.*

The court properly charged the jury, in effect, that if the railway company's fireman and engineer, engaged in pushing a train of cars ahead of the engine, on approaching the street-car crossing, were signalled to stop in time to have avoided the collision, but, by reason of negligence, failed to catch the signal, the railway company would be liable.

5. *Collision—Presumption of negligence.*

In an action for a killing caused by collision between a street-car on which deceased was a passenger and a railroad train, the court properly charged the jury that negligence on the part of the street-car company could be presumed from the mere fact of the collision, but that, to justify a verdict against the railway company, a preponderance of the evidence must show that it was guilty of negligence contributing to the injury.

6. *Instruction—Duties of street-car driver.*

In an action for the death of a street-car passenger caused by a collision between the car upon which he was riding and a railway train, if there was no evidence as to the duties of the street-car driver, a charge detailing a set of duties and rules for his guidance was properly refused.

7. *Railway—Negligence of trainmen.*

It was proper to refuse to charge that the railroad men were justified in supposing that the street-car driver would stop before getting upon the track in front of an approaching train, and that, unless they were guilty of negligence in not stopping their train quick enough after discovering the peril of the street-car, the jury could not find a verdict against the railroad company; since the railroad men, before seeing the street-car, might have been guilty of some act of negligence which rendered them incapable of preventing the accident.

Appeal from Lonoke Circuit Court.

ROBERT J. LEA, Judge.

Wallace M. Harrell, as administrator of the estate of J. C. Gist, deceased, brought this action against the Little Rock & Memphis Railway Company and the Little Rock & Argenta Street Railway Company to recover damages for the negligent killing of his intestate. The facts are stated by the court as follows:

This action was instituted in the Lonoke circuit court, at its January term, 1892, by the appellee, administrator, for the benefit of the widow and children of his intestate, J. C. Gist, against both the appellants, for the negligent killing of said Gist, in a collision between their cars in the town of Argenta, on the 26th day of November, 1890, laying his damages at the sum of twenty-five thousand dollars.

There was a trial; verdict and judgment for the full amount claimed; motion for new trial, made by each of appellants, overruled; exceptions taken; bill of exceptions tendered and signed, and appeal taken to this court.

Abstract of the Evidence.

On the day named, the deceased took passage at the "Little Rock & Fort Smith Railroad Crossing" on one of the cars of the defendant' street-car company, en route to the city of Little Rock, and for some time rode standing on the rear platform of the car, when the street car driver, according to his testimony, finding that deceased had gone as far as he (the driver) was permitted to carry a passenger who has not paid his fare, left the front platform, and went back to demand his fare of deceased. They seem to have had some conversation as to the payment of the fare to the opposite side of the river, rather than to the river only, and the driver returned to his post on the front platform, the mule attached to the car in the meantime moving on at a trot. Afterwards, the deceased went into the car, and towards the front, and proposed to the driver to pay his fare if he could make the change for him, and the driver stepped back just inside the car to make the change, when they both seemed to have seen a freight train of the defendant railroad company backing across their track, and a collision impending, and the driver jumped off his car at the front and the deceased jumped off at the rear, the backing train striking the street-car, turning it around and upon the deceased, killing him almost instantly.

It appears from the testimony that the track of the defendant street-car company runs on Newton avenue, one of the principal streets of Argenta, and the track of the defendant railroad company runs parallel to Newton avenue, and about fifteen or twenty feet from the street car track, some distance along the east side of the avenue, and then turns west and across it, going on in the direction of the "Oil Mills." The train of the defendant railroad company involved in the collision was composed of a switch engine and three freight or box cars, the engine moving forward, and pushing the three box

cars in front of it.   On the engine was an engineer at
his post on the right side of the cab, a fireman on the
left side, the manager of the train on the front end of
the farthest box car from the engine, and a brakeman
on the next box to the front one.   The proof shows that
they were required to station themselves substantially
as they were, so that the one on the front could observe
obstacles on the track and transmit signals back to the
engineer, so as to control the movements of the train,
and avoid accidents.   The foreman of the train on the
front car, when unable to give his signals direct, made
them to the intermediate brakeman, who repeated them
to the engineer, either directly or to the fireman, and he
in turn to the engineer, according as the circumstances
might dictate.

The following extracts from the statements of wit-
nesses will perhaps best describe the incidents and
actions of parties immediately preceding and leading up
to the accident.

John D. Adams says:   "I was foreman of the engine
pushing the train when this accident happened.   It was
my duty to have controlled this train.   I was on top of
the furthest car from the engine, and controlled the
movements of the train.   There was another switchman
with me, who was on the first car behind me, I think.
I cannot say how far the street car was from the cross-
ing when I first saw it.   It was moving, and so were
we.   I gave no signal to stop until I saw the street-car.
We may have been one hundred yards from the crossing
then, or not so far, and the street-car was going about as
fast as our train.   The mule was trotting.   We were per-
haps running eight miles an hour.   I saw nobody on the
street-car at all.   I could see nobody on the front plat-
form.   I gave the stop signal as soon as I saw the street-
car.   I did not run back on the car toward the engine,
but stood still and holloed to stop the street-car.   There

was a man on the car between me and the engine, and he took my signal. I turned my head to see if the man next me had caught my signal. I saw that he had and commenced repeating it. I do not know whether he was. standing up or sitting on the side of the car. I think the other man ran back to the engine, and I think he holloed. The other man on the car was a switch-man. It was my duty to give signals to him when I saw obstructions, and his to repeat them to the engineer."' And again he says: "I was foreman of the engine at. the time of the accident. I was on the box car furthest. from the engine. The engine was pushing three box cars ahead of it. I was on the right hand side of the car. We had got from the main line, and were carrying these empty cars to the oil mill. I think the engineer blew his whistle. He always blows when he wants to. run the crossing. About opposite the lumber yard there, I gave a slow signal to indicate to the engineer to. be careful in going to the crossing. At that time I had not seen the street car. We had gone a short distance when the street-car showed up, and I could see no one on the front of it. As soon as I saw the street-car I. gave the danger signal to stop, and holloed to the switchman. I also holloed at the engineer, and to the street-car driver. I cannot say exactly how far I was. away. I was on a moving train, and had my eyes on the street-car. After I saw the street-car, and gave the danger signal, I threw my head around to see if the other switchman had caught the signal, to give it to the engineer. I saw he had, and kept my eye on the street-car. Neither our train nor the street-car was far from the crossing. I think we were just entering the curve,. but I cannot be certain. The train stopped almost im-mediately after striking the street-car. The car that struck the street-car stopped on the crossing. When I gave the slow signal; it was for a caution, and not for

the street car.   I believe the cars were running eight or
ten miles an hour.   I think they had checked up some at
the time I gave the danger signal.   It is customary to
give a slow signal at this point in switching on that
track.   When I first gave the slow signal, we may have
been 150 yards from the crossing.   We may have been
fifty yards from the crossing when I gave the danger
signal, but I cannot be positive.   If the engineer had got
the signal at the time I gave it, he might have stopped
the train.   It appears that when I was before the coro-
ner's jury, on the day after the accident, I testified that
the train was 200 feet from the street car when I gave
the danger signal.   I also testified that the train did not
slow up as soon as it usually did.   I gave the danger
signal, and holloed to the driver at the same time.   In
the Byers case I testified that I supposed we were in a
hundred yards of the street-car crossing.   I was holloing
at the street-car, and signaling to the engineer.   I
could not see the engineer from where I was, nor could
he have seen me, so that there was no chance of his
taking the signal as soon as I gave it.   It had to be re-
peated by the man behind me to the engineer.   I looked
back, and saw this man had taken my signal and started
to the engine with it.   The fireman was on the inside of
the curve, and could have a better chance to see me,
though I do not know whether he could or not."

Henry Diebert says :   " I was a switchman on the
second car from the engine.   In approaching the cross-
ing, Adams, who was on the car farthest from the en-
gine, gave me a slow signal some seven or eight hun-
dred feet from the crossing, up by the lumber yard.
He gave a quick signal to stop about at the point of the
curve.   I took it, and repeated it to the engineer as soon
as possible.   I got up and ran to the next car to the en-
gine.   I got a glimpse of the street-car as I turned
around.   There was some steam escaping from a brake

between me and the engineer, on the engineer's side. We generally give a slow signal down by the lumber yard. That was two or three blocks from the crossing. I do not know whether the engineer could see me when I repeated the signal, as the cars were between us, but the fireman probably could. When the danger signal was given, the first part of the car was on the curve."

W. R. Johnson says: ''I was the engineer on the train that had the accident. The train was going north to the oil mill, carrying some empty cars. We were probably running about four miles an hour. I blew for the crossing about the lumber yard, or, maybe, a little on the other side. This is where we ordinarily blow for the crossing. The fireman was ringing the bell along the avenue. That is his business. The engine was headed north, and was pushing the cars in front of it toward the north, and I was on the right side. The first thing I knew of danger ahead was that the fireman told me there was a car on the track. I then reversed the engine, put on the brakes, and stopped the engine as soon as I could. I did not see Diebert. The first I saw of him was when we were about stopped. He was then coming back to the engine on top of the train. I had then already got the signal from the fireman, and did all I could to check the train. I do not think the train went over a car length after I got the signal. The front trucks of the head car were just on the crossing. I did not see Adams when he was giving the wild signals. The fireman might have seen him, as he was on the inside of the curve. The grade there is about level."

J. S. Staples says: ''I was the fireman on this engine. We were running north on the track on Newton avenue with three cars ahead of us. We blew four short whistles for a signal. I was ringing the bell all the time as we got toward the crossing. The engineer

shut off the steam, and we began to roll. As we got within fifteen feet of the crossing I saw the mule's nose, and told him to shut off and do what he could, for a street-car was on the track. He shut off and struck the street-car, and we did not go over the crossing. We were not going more than three or four miles an hour. At the time I gave the signal to stop we were going five or six miles an hour, an ordinary speed. It was my business to ring the bell. I had the bell cord in my hand. I spoke to the engineer to give him the signal to stop. He reversed the engine, pulled the throttle, and put on sand, and used the vacuum brake. He hauled the reverse lever over, and put the wheels in a back motion. There was nothing else he could have done. When I first saw the mule it was within ten feet of our track. I saw the mule's nose, and signaled to stop at the same time. I did not see the street-car, for our car was ahead of me on the curve. Harry Diebert, who was on the second car, gave me the signal to stop. I was looking forward. The car that struck the street-car was just barely across the track about two and a half inches. The engineer could not see the switchmen on the cars, for the train was on the curve. I could see one of them. I could not see the man on the furthest car. The car next the engine would be between him and me. It was my duty to look out on one side, and the engineer's on the other. When I gave the signal the engineer stopped in about a car's length. I did not hear anybody hollo to stop. The man standing on the car gave the signal to stop immediately."

C. E. Byers says : "I was the driver of the street-car. I had been driving in Little Rock for some time before I hired to the Argenta company. Gist got on my car at the Fort Smith crossing, at the north end of my road. I then started toward Little Rock, and drove until I came to the Fort Smith crossing. After I crossed

that I looked back, and Gist was still on the back steps, and he did not come in. He had ridden as far as the rules of the company allow without paying his fare, and I went back and asked him for his fare, and he said he would not pay fare until he got to the bridge, and if the bridge car was there, then he would pay his fare. I told him to pay five cents, and if the bridge car was there he could pay the other five cents. I went to the front and took up the lines, and Gist came to the front and asked for change. I reached my hand in my pocket to get some change, and heard somebody hollo, and looked up, and the train was right on us. I said "Run!" and supposed he got clear. I think I was fifty or sixty yards from the track when I took up the lines, and the mule was trotting along. I had one foot on the platform and one in the car. I was facing to the west. When he spoke to me about the change I dropped the lines over the brake handle. The first I heard of the train was the holloing. I did not hear any bell or whistle. I jumped off the front platform. The mule broke loose. I think if they had rung the bell or whistled I should have heard it. Gist did not pay any fare, for I had not changed his money."

Such is the testimony of all the persons engaged in the running of the train and street car. There were a great number of other witnesses (bystanders) who, making all proper allowances for the usual conflicts as to time, distance, locality and speed, do not materially differ from the train and car men. At all events, the statements of these latter, above given, are all that is essential to a discussion of the legal propositions that arise in this case.

### Instructions.

The instructions which become the subject of discussion are as follows, to-wit:

Instructions given by the court at the instance of the plaintiff, objected to by defendants, and objections insisted upon.

"6.  If you believe from the evidence that the defendant, the Little Rock & Memphis Railroad Company, had voluntarily stationed an employee on top of the cars' they were switching in front of the engine that collided with the street-car that deceased (Gist) was a passenger on, whose duty it was to give signals to the engineer and fireman, and thereby control the train's movements by the signals so given, it would be the duty of the employee so stationed, at all times while the train was moving backward along and through a public street or near the crossing of the street-car track, when street-cars were frequently crossing the railroad track, to be at a place on top of the moving cars where he could be seen by either the engineer or fireman, and could promptly communicate with one of them by his signal ; and if the evidence in this case shows that the employee so stationed on top of the cars was not in such a place where he could be seen and communicate with the engineer and fireman by his signals, and he discovered the danger and gave the danger signals in time to have averted the collision by having the train stopped if the engineer or firemen had caught his signals, and they failed to catch them because he was not in a proper place, this would be such negligence úpon the part of the Little Rock & Memphis Railroad as to charge them with the death of Gist if he was killed in the collision."

"7.  If you believe from the evidence that the defendant, the Little Rock & Memphis Railroad Company, voluntarily stationed an employee on top of the cars that were then being switched in front of the engine, whose duty it was to keep a lookout and give signals to the engineer and fireman, by which the movement of the train was governed, and the train was backing

along and through a public street used for travel, and that the switch track of the railroad crossed the track of the defendant street-car company, where street-cars were being operated all the time, then, under such circumstances, it would be the duty of the engineer or fireman to keep a lookout at all times, while so backing, for signals from the employees on top of the cars. And if you believe from the evidence that the employee on top of the cars was in a proper place where he could be seen by the engineer or fireman, and that he gave the danger signal to them, and thereby ordered them to stop at once, in time for them to have stopped the train and averted the collision, and that the engineer and fireman, by reason of their not being on the lookout for signals, or by reason of their carelessness and negligence in not catching the signals when first given, if you find that they were given in time to stop the train, they would be guilty of such negligence as to charge the Little Rock & Memphis Railroad Company with the death of Gist, if you believe he was killed in the collision while a passenger on the street-car."

Instructions on the court's own motion given and objected to by defendants, and objections insisted upon in argument:—

"You are instructed that the persons in charge of the train had the right to presume that the street-car driver would use reasonable care in ascertaining whether or not there was danger before attempting to cross the railroad track. They were under no obligations to anticipate that a street-car would approach the crossing without a driver controlling its movements and watching for danger; but, if they discovered the street-car without a driver, or with a driver who was negligent in his duty, approaching and near the track and in danger of a collision with the railroad train, it became their duty to do all in their power to prevent such a collision,

and if, after discovering such danger and negligence of such street-car driver, they could have stopped the train and prevented the collision, but failed to do so, the railroad company is liable for the injury that resulted therefrom to the plaintiff's intestate."

Instructions asked by the defendant railroad company, refused by the court, and made the subject of contention in argument :—

"5. Before the plaintiff can recover of the railroad company, he must show that the street-car company was not guilty of any negligence. The deceased was a passenger upon the street-car, and if the street-car driver negligently left the front platform while approaching, or failed to look and listen before starting across, the railroad track, the plaintiff cannot recover of the railroad company, though he may still recover of the street-car company."

"1. You are instructed that the mere fact of the accident raises a presumption of negligence against the street-car company because the deceased was a passenger upon its car, but the mere fact of the accident raises no presumption of negligence against the railroad company. You are therefore justified in finding a verdict against the street-car company from the mere fact of the accident (unless the evidence in the whole case rebuts the presumption of negligence on the part of the street railway company), but before a verdict can be found against the railroad company you must be satisfied by the preponderance of testimony that it was guilty of negligence contributing to the injury."

"3. It is the duty of the street-car driver to remain upon the front platform of his car while it is in motion. If it becomes necessary to leave the platform, he should stop the car, and not put it in motion until he returns to the platform and takes the reins. He should never allow the car to move except when he has the

reins in his hands, and particularly is this true when he approaches a railroad crossing or other place where there is danger of a collision. If you find that, in approaching the crossing, the street-car driver was not at his post on the front platform, you will find that the accident was occasioned by the negligence of the street-car company; but, in order to make the railroad company responsible, it must appear from the preponderance of the evidence that the railroad men, after seeing the perilous condition of the street-car, failed to use reasonable exertions to prevent the injury."

"4. It was the duty of the street-car driver, before attempting to cross a railroad track, to look and listen for approaching trains; and if the street-car driver in this instance failed to do that, the street-car company is responsible for his negligence; but the railroad men were justified in supposing that he would stop before getting upon the track in front of an approaching train, and, unless they were guilty of negligence in not stopping their train quick enough after discovering the peril of the street-car, you cannot find a verdict against the railroad."

*U. M. & G. B. Rose* for appellant railroad company.

1. Evidence as to other acts of negligence on the part of Byers, the street-car driver, at times and places near the time and place of the act complained of, should have been admitted. 48 Ala. 15; 14 N. Y. 218; 32 *id.* 346; 49 *id.* 421; 42 Vt. 450; 42 Ill. 358; 46 N. H. 23.

2. The court erred in the instruction given on its own motion. It was not the duty of a *non-carrier* to do *all in its power* to prevent a collision. That only applies to carriers of passengers. 2 A. & E. R. Cases, 172; 26 *id.* 393; 32 *id.* 16; 18 *id.* 144.

3. The fifth instruction for the railroad should have been given. A passenger in case of a collision

cannot recover against the other party, if his own carrier was at fault.  8 C. B. 115, followed by 46 Pa. St. 151; 43 Wis. 513; 39 Iowa, 523; Patterson, Railway Acc. Law, 86; 2 A. & E. R. Cases, 172; 37 *id.* 505; 15 Ark. 118.

4.  The sixth and seventh instructions for plaintiff are instructions upon facts, and usurp the province of the jury.  37 Ark. 581; 49 *id.* 148; 55 *id.* 248.

5.  It was error to modify the first instruction asked by the railroad company.

6.  The refusal of the third for the railroad company was erroneous.  They should have been instructed as to the duties of street-car drivers.  18 Am. St. Rep. 525; 42 Minn. 490.

7.  It was error to refuse the fourth instruction. 54 Ark. 431.

8.  The judgment should have been declared a lien on the property of the Street Railway Company.

9.  The verdict was excessive.  57 Ark. 377; 47 N. J. Law, 28.

*J. H. Harrod* and *E. A. Bolton* for appellee.

1.  Evidence of specific acts of negligence at other times was properly excluded.  The rule is, it is proper to prove the general character for carelessness or the contrary, and not to give examples of either.  But the exclusion did not prejudice the railroad company.  31 Ark. 364; 43 *id.* 219; *Ib.* 535; 44 *id.* 556.

2.  The court did not instruct the jury that it was the duty of those in charge of the train to do all in their power to prevent a collision.  It *was* the duty of the company to do all in their power *after they saw the danger.*  Where a street-car crosses a railway track, the greatest care and prudence, every practicable precaution that human foresight can devise, should be taken to avoid collision.  8 So. Rep. 586; 20 S. W. Rep. 392; 86 Ky. 578.

3. It is now well settled in this country that a passenger can recover for an injury sustained through the negligence of another company than that carrying him, whether his own carrier be negligent or not. 116 U. S. 366 ; Bishop, Non-Contract Law, sec. 1070-1 ; 30 Minn. 328 ; 98 Ind. 186 ; Beach, Cont. Neg. secs. 65, 108, 118 ; Thompson, Carriers, 281 ; 36 N. J. 225.

4. There was no error in the sixth and seventh requests. 8 So. Rep. 586 ; Pierce on Railroads, p. 356.

5. It was not error to refuse the third and fourth prayers by the railroad company.

6. The verdict is not excessive. Mansf. Dig. sec. 5226.

*J. M. Rose* for the Street-Car Company, contends that the Act of 1887 does not apply to street railways.

*M. M. Cohn* also for the Street-Car Company.

The court properly refused to declare the judgment a lien on the property of the Street Railway Company. The railroad company saved no exceptions to the ruling of the court on this point, and is not interested in it.

BUNN, C. J., (after stating the facts). The appellant street-car company in argument is made to defend mostly against the contention of plaintiff in the court below that a lien can be fixed upon its property for any judgment rendered in this action, under the act approved March 19, 1889 ; and its counsel in their briefs do not make any specific objection to the instructions and admission of testimony.

1. Evidence of previous negligence inadmissible.

The first contention of the appellant railroad company is that the court below erred in not permitting it to introduce other and previous acts of negligence of the street-car driver, Byers, at times and places near the time and place of the act complained of.

There are several different states of case in which the proposition of appellant's counsel is correct. Thus,

where one uses defective machinery or appliances, and an accident occurs of which, in the very nature of things, it is impossible or impracticable to obtain any direct or positive proof of the particular fact—in such a case, evidence of accidents and instances similar to those in question, that have previously occurred, is admissible to show that the person using the machinery or appliances had previous knowledge, or should have had, of the defects by and through which the injury had been done; also the probability that the injury was the result thereof. The most frequent illustration of this rule is in the case of locomotive engines emitting an unusual amount of sparks by reason of imperfect spark arresters, and so forth. This, as is known, is the fruitful source of fires along railroad tracks; and, in all these cases, evidence of previous operations of the engines has been held admissible, not only as fixing notice, but under the doctrine of probabilities, as in the case of *Cleaveland* v. *Grand Trunk Railway Company*, 42 Vermont, 449, cited by counsel. So, also, does that rule hold good in regard to injuries occasioned by defective railroad track, as in the case of *Mobile Railroad* v. *Aschraft*, 48 Ala. 15, also cited by counsel. This kind of evidence is also admissible to prove the habits of a horse, when the question is whether he was injured through his fright or viciousness, there being no other way to determine the question; as in the case of *Whittier* v. *Franklin*, 46 N. H. 23.

But the rule in cases like the one under consideration, where the question is simply one of negligence or non-negligence on the part of a person on a particular occasion, is that such evidence is not admissible. See *Christensen* v. *Union Trunk Line*, (Wash.) 32 Pac. Rep. 1018; *Towle* v. *Pac. Imp. Co.* 33 Pac. Rep. 207; *McDonald* v. *Savoy*, 110 Mass. 49; *Hays* v. *Millar*, 77 Pa. St. 238; *Boich* v. *Bissell*, (Mich.) 45 N. W. Rep.

55; *Atlanta, etc. Railroad Co.* v. *Newton*, 85 Ga. 517, also reported in 11 S. E. Rep. 776.

<span style="float:left">2. Instruction as to negligence approved.</span>

The second contention is that the instruction given by the court on its motion is erroneous, in that it instructs the jury that it was the duty of those in charge of the train "*to do all in their power to prevent the collision*;" whereas, as is contended, the trainmen were not held to the highest degree of care in respect to the deceased, he not being their passenger at the time. That position is correct in a sense, and yet it is misleading in the manner in which it is here stated. In the first place, the court below did not instruct the jury that the trainmen owed deceased, as a passenger on the street-car or otherwise, the *highest degree of care*, nor words to that effect, as the contention seems to imply, but the language of the court was that they should have done all in their power to prevent the collision "*when they discovered the street-car without a driver, or with a driver who was negligent in his duty, approaching and near the track, and in danger of a collision with the railroad train; and if, under such circumstances, they could have stopped the train in time to avoid the collision, and failed to do so, the railroad company is liable.*" To do all they could in the exigency stated by the court was nothing but ordinary and reasonable care and diligence under the circumstances; and the ordinary care to which non-carriers are bound is a care that varies with the circumstances of each case.

<span style="float:left">3. Doctrine of imputed negligence disapproved.</span>

The third contention is that the court erred in refusing to give the fifth instruction asked by the defendant railroad company, which was to the effect that a passenger, in case of a collision, cannot recover for injuries occasioned thereby against the other party, if his own carrier is at fault. This doctrine had its origin in the English case of *Thorogood* v. *Bryan*, 8 C. B. 115, and all the American cases in which it has prevailed have

been decided upon the authority of that case.  It, however, has perhaps never received anything more than a minority support in this country.  That case has in recent years (1888) been brought on appeal to the House of Lords, and each and every one of the grounds upon which it rested has there been held to be unsound, and the case, consequently, has been overruled.

We do not regard the case of *Duggins* v. *Watson*, 15 Ark. 118, cited by counsel, as being strictly in point, although it does in a manner refer to the then English rule as announced in *Thorogood* v. *Bryan* as the law applicable to that case.  However that may be, the law now is that where a passenger is injured in a collision, the non-carrier may be sued, notwithstanding the carrier is also at fault.

The fourth contention is that the court erred in giving the sixth and seventh instructions asked by the plaintiff.  The majority of the court are of the opinion that the sixth instruction is abstract, but that the error is not prejudicial.  The seventh instruction was properly given.

4. As to negligence resulting in a collision.

The fifth contention is that it was error in the court to modify the first instruction asked by the defendant railroad company by the insertion of the words included in the brackets.  The court, in the first part of the instruction, had declared the law to be that the mere fact of the accident raises a presumption of the negligence of the street-car company, because deceased was its passenger at the time, but there is no such presumption against the railroad company.  The court then said to the jury that they would be justified in finding against the street-car company from the mere fact of the accident, with the qualification in the brackets, "(unless the presumption is rebutted by the evidence in the whole case);" and then proceeds to instruct them that they cannot find against the railroad company unless its neg-

5. Presumption of negligence from collision.

ligence is shown by a preponderance of evidence, as there is no presumption of its negligence in the case. We cannot see the error in this modification; and if there be such, it is, we think, harmless.

6. As to duties of street-car drivers.    The answer to the sixth contention is that there is no evidence as to what were the duties of the street-car driver, and it would be manifestly improper for the court to detail a set of duties and rules for his guidance in the way of instructions. There was no error in refusing the third instruction asked by the defendant railroad company. Besides, the law on the point was sufficiently declared in other instructions given.

7. As to negligence of trainmen.    We do not think the court erred in refusing the railroad company's fourth instruction. While it is doubtless true that the street-car driver should have kept a lookout for trains crossing his track, yet, if he did not, that fact alone might not exonerate the railroad trainmen, even though they did everything they could to prevent the accident after they saw the street-car. Something they did or neglected to do before seeing the street-car might have placed them in a position which rendered it impossible—more difficult, at least—to prevent the accident. The instruction was misleading, and should have been refused.

The question whether or not the property of the street-car company is the subject of the statutory lien for the judgment rendered in cases like this is presented to us only by the pleadings of the plaintiff, and he abandons that contention in his argument. We have not, therefore, that question before us.

This is a suit for compensatory damages only. By the first instruction given to the jury at the instance of the plaintiff, which is a copy of the statute on the subject, they were told, in effect, that if they should find for the plaintiff they "should give such damages as they shall deem a fair and just compensation to the wife and

next of kin (in this case to the administrator) with reference to pecuniary injuries resulting from the death of deceased." There was not evidence to justify the jury in fixing the amount they did in this case. They simply gave the plaintiff the exact and full amount he claimed in his complaint, and apparently failed to consider very carefully the evidence as to that part of the case. We are unable to find from the testimony, viewing it in the most favorable light to the plaintiff, from any standpoint, that the damages could have much exceeded the sum of twenty thousand dollars, and in so far the verdict was without evidence to sustain it, and the judgment will be reversed for that cause unless the plaintiff will, within fifteen days, enter a remittitur down to the sum of $20,000, in which case the judgment for that amount will be affirmed.