13743.  GEORGIA RAILROAD & BANKING CO. *v.* WALLIS.

1. This was an action for damages by one as guardian of certain children, whose mother had died previously, for the death of the father, whose death was alleged to have been caused at a public street-crossing by the negligence of the defendant in the operation of its train. There was evidence sufficient to support the verdict in favor of the plaintiff.

2. It cannot be held as a matter of law that the verdict in the instant case was for a sum so large as to evince any prejudice or bias on the part of the jury, or that it was in any degree beyond the amount which the jury in the exercise of their legitimate functions could have found from the evidence.

3. There was no error in admitting the testimony of a witness for the plaintiff, " I have never known the railroad to maintain a watchman or guard at that crossing," over the objection merely that such evidence was irrelevant and immaterial, and did not " relate to the time of the accident."

4. There was no error in the exclusion of evidence offered by the defendant that a witness in the case appeared before a grand jury to give evidence in an inquiry in relation to some alleged criminality of the decedent, nor in the exclusion of bills of indictment charging the decedent with previous crimes, but upon which there had been no conviction or trial, even if such indictments could at all have been admissible. None of such evidence was relevant or material as illustrative of the value of the life of the deceased or of his reckless and negligent character, notwithstanding a contention of the defendant that the death of the decedent was the result of his own negligent and reckless acts. *Slappey* v. *Sumner*, 136 *Ga.* 692 (71 S. E. 1075).

5. Although the homicide occurred within the limits of an incorporated town or city, and notwithstanding the provisions of the act of the General Assembly approved August 19, 1918 (Ga. L. 1918, p. 212), as to the erection of blow-posts and the blowing of the whistle, do not apply within the bounds of incorporated towns or cities, there was no error in giving in charge to the jury the entire act, including these provisions, since the act imposed upon the defendant other duties, to which the evidence as related to the time and place in question was applicable, and since the act itself contains an express declaration, which was included in the charge, that the statutory requirement to erect blow-posts and to blow the whistle as stated in the act does not apply to incorporated towns or cities. It cannot be reasonably presumed that intelligent and upright jurors could have been misled or should have misapplied the latter express declaration of the statute as precluding in this case any rightful application by them of the provisions of the act relating to blow-posts and the blowing of the whistle.

6. The court having instructed the jury that the plaintiff could not recover if the decedent could have avoided his death by the exercise of ordinary care or if his negligence was the proximate cause of his death, and having also fully instructed the jury upon the law of comparative negligence, there was no error, especially in the absence of a written

request, in the failure of the court to give in charge the express terms of section 2781 of the Civil Code (1910) to the effect that no person shall recover for injury to himself or his property which is caused by his consent or his negligence. Moreover, the only assignment of error upon the omission is that another correct principle which was charged was error for the reason that this section was not given in connection therewith. See *Killian* v. *State*, 19 *Ga. App.* 750 (2) (92 S. E. 227); *Seaboard Air-Line Ry. Co.* v. *Devlin*, 18 *Ga. App.* 271 (2) (89 S. E. 378); *Louisville & Nashville R. Co.* v. *McGarity*, 139 *Ga.* 472 (2) (77 S. E. 630), and cases there cited.

7. Whether in any event an instruction that in determining the value of the life of the deceased the jury would be limited to a consideration of his earnings as derived from legitimate and lawful occupations solely, in contrast with engagements unlawful in nature, would be proper, there was no error, under the evidence as shown in the record, in omitting such a charge in the absence of a written request properly made.

8. Assuming (but not deciding) that section 4502 of the Civil Code, to the effect that " damages are given as compensation for injury done," etc., could be applicable in any event in a suit for damages for a negligent homicide, there was no error, in view of correct instructions given as to the measure of damages, and in the absence of a written request therefor, in omitting such a charge in the instant case; more especially since the assignment of error upon such omission complains only that another instruction which was given and is unexcepted to was not accompanied by a charge of this section. *Killian* v. *State*, supra.

9. In view of the context and the charge of the court as a whole, the court did not, for any reason assigned, err in charging as follows: " You could reduce it (the full value of the life of the deceased) to its present cash value, and your verdict should be for such sum as, if put out at interest at seven per cent. per annum, and exhausting a part of the principal each year, would produce each year what you find would be the decedent's yearly earnings, and the entire sum would be exhausted at the end of the decedent's expectancy as you find it. In other words, the amount found, with the addition of seven per cent. legal interest, would accomplish exactly such payments each year throughout the decedent's expectancy as you find that he would have earned during that expectancy and would be exhausted at the end of his expectancy."

10. This court cannot hold that the trial judge abused his discretion in overruling the motion of the defendant for a new trial.

DECIDED FEBRUARY 21, 1923.

Action for damages; from Greene superior court — Judge Park, May 25, 1922.

On March 4, 1921, James Wallis was killed at a public street-crossing in the city of Union Point by a train of the defendant railway company. He left no wife surviving, and W. A. Wallis, as the guardian of his five minor children, brought an action for damages for his homicide. The decedent, at the time of his death, was traveling in a truck and was in the act of crossing the com-

pany's track. The following acts and omissions of the defendant
are charged in the petition as negligence: operating the train
at a speed of from forty to fifty miles per hour, in violation of the
dictates of ordinary care and prudence, the homicide having oc-
curred in a populous community; failing to keep a proper lookout
ahead, and, even after discovering the presence of the truck ap-
proaching the crossing, failing to give any signal by bell, whistle,
or otherwise, and failing also then to check the speed of the train;
the failure of the engineer and fireman to have the train under
control; failing to maintain a watchman at the crossing, which
was alleged to be in a populous town, well travelled and crossed
by several railroad tracks; and failing to have at the crossing
some electrical or other signaling device or gates. The decedent
was alleged to have been of the age of forty years at the time of
his death, with an expectancy of 27.60 years, and earning at the
time $1,500 per annum.

The defendant denied all acts of negligence alleged, and further
pleaded that the decedent failed to exercise ordinary care and dili-
gence for his own safety in approaching the railroad crossing;
that he was at the time traveling at a high rate of speed, and did
not look or listen to ascertain whether a train was approaching;
that if he had not been guilty of such negligence the death would
not have occurred; that his own negligence and carelessness, not
only in this but in not having his vehicle under immediate control,
was the proximate cause of the homicide.

There was no dispute as to the age of the decedent, and there
was evidence tending to support the allegation as to his earning
capacity. The evidence as a whole showed the following facts or
authorized their inference: The decedent was returning from
Augusta in a truck which was empty or practically so. The body
of the truck was built up on its sides by "standards," to in-
crease its loading capacity. It was noisy. A few moments
before the decedent was killed he stopped at a filling station at a
street-corner, and on leaving it he entered upon a street and started
in a northerly direction. This street was intersected by the rail-
road-track, which ran generally east and west. The distance from
the filling station to the point at which the homicide occurred was
127 feet. There were five tracks to be crossed, and the decedent
had passed three of them and was upon the fourth. The train was

approaching from his right, traveling in a westerly direction; the railroad depot, at which the train would in any event have stopped, was to his left approximately 170 yards, or possibly further, from the center of the street upon which he was traveling. The train was in the range of his possible view at all times from his departure from the filling station, for a distance of at least 300 or 400 yards along the track to his right, from which direction the train was approaching, with the exception that upon the second track there were two coal cars standing some 80 feet to the right of the east edge of the street, though one witness estimated this distance to be very much shorter. This would have cut off his view toward the train for a part of the distance he traveled before his death. He could have seen the train, however, after passing the track upon which these cars were standing. A number of witnesses saw him shortly before he was killed, and one or more sought to call his attention to the approach of the train. The man who had waited upon him at the filling station called loudly to him several times, but was not sure that he heard the calling, although at the last call he did turn his face well to the left. None of the witnesses saw him look out at all for the train. Many of them testified that he could have seen the train had he looked, some of them positively that he did not look. The evidence tended to show that he was entirely sober at the time; that he was traveling very slowly, some of the witnesses estimating his speed at from four to six miles per hour at the time he was struck; others placed his speed somewhat higher. It was inferable that he was shifting the gears of his vehicle either at the time of or shortly before the collision. There was no evidence that he was ever aware of his peril. He was instantly killed.

The evidence showed that the engineer blew the whistle of the train as the station signal before arriving at the street. The speed of the train was variously estimated at from 18 to 20 miles per hour, though one witness testified that it was running from 20 to 30 miles per hour. The crossing appears to have been in a more or less populous locality. No witnesses testified positively that the bell was not ringing in compliance with the law; a number of witnesses, including the employees of the company, testified positively that the bell was ringing. Many other persons, whose hearing was not shown to be impaired, and with opportunities to

have heard, testified that they did not hear any ringing of the bell, though they would not swear it did not ring. One witness declared that the truck " made an awful racket," and that the train was making the ordinary noise of a passenger-train,— of the exhaust of the engine and the shaking of the cars. He said: " I don't know which made the most noise, the train or the truck. . . The passenger train made . . the usual noise." Another witness testified: " Fluker hollered at him (the decedent) two or three times, and just a moment or two before the engine hit him he kind of looked over his left shoulder (in the opposite direction from the train). He had gotten on the second track then, going mighty slow,— four or five miles an hour, I reckon; when he looked back that time he had about got on the main line, and I guess it was too late for him to do anything then, and the train hit him right now." The truck " was running so slow that if he had put his foot on the clutch or on the brake he could have stopped in a few feet or yards."

The engineer testified: " The first I knew about hitting this man was when I heard the crash; he came from the opposite side from me, and I never did see him, because the boiler of the engine cut off my view. When I hit him I stopped as quickly as I could. The grade is heavy but very short, and after passing the coal chute [300 or 400 hundred yards from the crossing] I coasted down to the station. I had applied my brakes lightly before I got to this crossing. I should judge that we were running 18 to 20 miles an hour. . . A passenger-car length is from 60 to 75 feet, and I had four cars in that train, including a Pullman. . . My fireman was on the left-hand side of the engine, and after he passed the coal chute he had a clear view of everything; if he had been looking out of the window I think Fluker's automobile stand [from which decedent had just departed] is clearly visible to him, and I judge he could have seen an automobile standing there or going to the crossing, and if it had started on the tracks he could have seen it. I don't think there was anything to keep him from seeing it from Fluker's to the main line. He didn't call my attention to any automobile or anybody coming at all. We have a steam whistle but no air whistle on that engine. In an emergency I would blow the steam whistle, and if I had known the automobile was coming on the track I could have blown the steam

whistle. . . If that automobile was going 4 or 5 miles an hour from Fluker's tank I could have blown my whistle. . . There was no watchman at that crossing on this occasion and no gates or electrical bell that I ever heard of. . . I said there was nothing I knew of to keep my fireman from seeing the truck, and likewise there was nothing to keep the man in the truck from seeing the fireman, the engine, and the rest of the train. My fireman was sitting with his face looking up the track when we were coming in. We don't stop every time we see an automobile on a public road," The fireman testified: " The engineer blew for the station beyond the coal chute, and as we were approaching the crossing a gentleman came out, and I couldn't see him until he got out and it was too late to say anything to the engineer; he was fixing to blow for the board when we hit the truck. The first time I saw the man that got hurt [killed] was when he came from behind those two coal cars and we were between 25 and 30 yards of him then. . I was looking out but could not see him as he left Fluker's garage. I was ringing the bell at the time. . . I couldn't see the man until he came out from behind the cars; then he had two more tracks to come across and it was too late to call to the engineer. The man who was killed was running 6 or 8 miles an hour. The width of a track is something like 5 feet. There are 5 or 6 feet between tracks, and that would put him 20 feet away. It scared me so I couldn't say nothing and he was right on me about 20 or 30 feet. He had just come from behind the cars and had about 20 or 30 feet to go, and my train had pretty close to 100 feet to go. I didn't holler to the engineer. . . I never did see him before he got from behind those cars, which were on a parallel track with our track. I reckon the effect of those cars was to shut off our vision for more than 100 feet. I had no way at all at that time of knowing that anybody was behind there. If I had been looking as carefully as a man ought to have been looking, I could have seen the truck. I was not expecting the man to drive out as quick as he did. . . I was not firing at the time. . . I was ringing the bell. I don't think the engineer could have stopped after I saw the man. . . If he had been going four miles an hour he could probably have stopped his automobile 10 or 15 feet." While there was very much more

testimony given, the foregoing will illustrate in a general way the issues of fact involved.

The jury returned a verdict in favor of the plaintiff for $8,500. The defendant made a motion for new trial, containing, besides the general grounds, several special assignments of error which are indicated and referred to in the headnotes. The motion was overruled and the defendant excepted.

*F. B. Shipp, Miles W. Lewis,* for plaintiff in error.

*Reuben & Lowry Arnold, Howard Thompson, Noel P. Park,* contra.

BELL, J. (After stating the foregoing facts.)

1, 2. It is strongly maintained by the plaintiff in error that the evidence demanded two conclusions: (1) that the presumption of negligence, which arose against the company upon proof of the killing as alleged, was entirely removed; (2) that the decedent's own carelessness or failure to exercise ordinary care was the proximate cause of his injury; either of which would absolve the defendant from any liability. Waiving the question as to whether or not the jury would have been authorized to find negligence on the part of the company in failing to keep a guard or watchman or to have any gates or other signals at this crossing, and also as to whether there was negligence in the speed at which the train was moving at the time and place in question, considering the populous character of the crossing, we find that the jury were authorized, though of course not required, to infer that the company was negligent in at least two of the particulars charged in the complaint. The evidence does not demand a conclusion that some warning could not have been given by the railroad company's employees after the perilous situation of the decedent was discovered by the fireman. Whether the fireman's judgment, that any effort to avoid the killing of the decedent after his presence was discovered would have been of no avail, was well founded, or negligently unfounded, was under the particular facts and circumstances disclosed by the record, peculiarly a question for the jury.

It is insisted by the plaintiff in error, upon the authority of *Rogers* v. *Georgia Railroad Co.,* 100 *Ga.* 699 (28 S. E. 457, 62 Am. St. R. 351), that there was no duty upon the part of the fireman to keep a lookout; and, while the point we are discussing is not.

one directly involving such duty, but rather involves the question of the duty upon the fireman after the presence of the decedent had been observed, it may be noted that the *Rogers* case was distinguished in the case of *Louisville &c. R. Co.* v. *Swann*, 120 *Ga.* 695 (48 S. E. 117). That case will demonstrate the liability of the railroad company in some instances for the negligence of the fireman. We quote from the decision as follows: "The law requires that the employees in charge of an engine shall keep a lookout for stock, but this is not the only duty imposed upon such employees. There are others of equal or greater importance. The duties which the evidence shows the engineer was engaged in were certainly of equal if not greater importance than looking out for stock, and under his testimony a sufficient reason was given why he did not see the stock, There being nothing in the evidence to charge the engineer with negligence, the question is whether the evidence sufficiently accounts for the failure of the fireman to be on the lookout. It has been held that a fireman being necessarily engaged in the performance of other duties indispensable to the running of the locomotive is a sufficient reason for not imputing to the company negligence on account of his not being on the lookout for stock. *Rogers* v. *Railroad Company*, 100 *Ga.* 699. In that case and in numerous others which have followed it, the fireman was engaged in firing his engine, which was a duty indispensable to the running of the locomotive. While a case might arise in which it would be a duty indispensable to the running of the locomotive for the fireman to sweep from the floor of the engine the coal that had accumulated there as the result of a long run and continuous firing, the record before us does not disclose such case, and the jury might find, under the present record, that it was not absolutely necessary that this duty should have been discharged at this particular time when the higher duties devolving upon the engineer were such as to prevent him from keeping a lookout. If the evidence had been that the engineer was engaged in the duties which he referred to in his testimony, and the fireman had been engaged in firing at a time when firing was indispensable to the operation of the train, and for this reason neither was on the lookout, a more serious and difficult question would have been presented." That ruling will show that the fireman was not without a duty, certainly after discovering the situation of the

decedent, to exercise care for his safety, and that the company would be responsible for any failure of the fireman to perform such duty.

It was issuable also as to whether the signal by the ringing of the bell was given as the cars were approaching. The act of the General Assembly approved August 19, 1918 (Ga. L. 1918, p. 212), imposed the duty of giving such alarm. While, if we were sitting as jurors, we might not have found against the company upon this question, we are not for that reason authorized to set their finding aside, when the jurors were not required, under the evidence, to determine this issue in favor of the company. The determination of the question depended upon a consideration of positive and negative testimony. All of the positive testimony was in favor of the company. A number who were close enough to have heard the ringing of the bell had it occurred testified they did not hear it. It is not suggested that any of these witnesses had not the normal capacity for hearing. "Negative evidence" does not amount to no evidence at all; otherwise the term would be a misnomer. And jurors are not obliged to discard it merely because of the existence of positive evidence in conflict therewith. "Where the existence of a fact was affirmed by positive evidence and denied by negative evidence, an issue was raised, and the trial judge committed no error in properly submitting such issue to the jury." *Western & Atlantic R. Co.* v. *Mallett,* 23 *Ga. App.* 367 (2) (98 S. E. 238). Negative evidence is only a species of circumstantial evidence. See also in this connection, *Innis* v. *State,* 42 *Ga.* 474 (1); *Pendergrast* v. *Greeson,* 6 *Ga. App.* 47, 50 (64 S. E. 282); *Hunter* v. *State,* 4 *Ga. App.* 761 (62 S. E. 466). So unquestionably the jury were authorized to find against the defendant upon at least two alleged grounds of negligence.

The question of the negligence of the decedent was naturally a matter also to be decided by the jury. They could hardly have found that he was guilty of reckless driving. His negligence could have consisted only in not looking out for the train. It may be that the call of Fluker diverted his attention. He finally turned his face partly toward the alarm. The jury were not acting without reason if they found that he was endeavoring to locate the noise of this call, and that in doing so he was relieved, at least to

some extent, from any imputation of negligence which might otherwise have been made because of his failure to look for the train. Fluker was to his left and the train was to his right. An inference was authorized that for some distance the two coal cars in some degree obstructed his view. Necessarily the jury have found that he was not so negligent as defendant. The evidence as disclosed by the record certainly did not demand a finding that his death was the result of negligence amounting to a failure to exercise ordinary care for his safety. If there was evidence of negligence of both the defendant and the decedent, it was still a question for the jury to determine as to what was the proximate cause of the death; and upon the question of comparative negligence it was for them to say to what extent, if any, his death was attributable to his own negligence. *Schofield* v. *Hatfield,* 25 *Ga. App.* 513 (103 S. E. 732). Also we cannot say that the verdict was excessive.

3. The evidence which is set out in the third headnote was not subject to the objection made thereto. Evidence is material and relevant when it sheds any light on the issue. The time covered by the answer of the witness extended to the moment of his testimony, and since it appears that his acquaintance with the crossing extended back to a time anterior to the homicide, the evidence objected to was obliged to include some reference to the transaction in question.

The brief of the counsel for the plaintiff in error contains the following statement: " It was competent for him to testify that no watchman or guard was at the crossing at the time Wallis and the truck were hit; but to allow a witness to testify that a defendant may have been guilty of acts of negligence at other times in the past is not permissible." So no question is presented as to whether a failure to maintain a watchman might be found by the jury to constitute a negligent omission. The assignment of error contained in the record objects that the evidence did not " relate to the time of the accident." It included such time, and therefore related thereto. Whether the evidence would have been objectionable as including a reference to other times also is not involved by the assignment of error as made.

4-8. No elaboration of the headnotes here indicated seems to be required.

5. There was no error in giving in charge the entire act of the General Assembly approved August 19, 1918 (Ga. L. 1918, p. 212), for the reason alleged, that the provisions as to the erection of blow-posts and the blowing of the whistle were prejudicial to the defendant. While the homicide occurred within the limits of an incorporated city, within which the provisions mentioned do not apply, the act contains an express declaration "that within the corporate limits of cities, towns and villages of the State the said railroad company shall not be required either to erect the blow-post hereinbefore provided for, or to blow the whistle of their locomotive in approaching the crossing or public roads in said corporate limits, but in lieu thereof the engineer of said locomotive shall be required to signal the approach of his train to such crossing in said corporate limits by constantly tolling the bell of said locomotive, and on failure to do so the penalties of this section shall apply to such offense." The giving of this entire act in charge could not be different from an erroneous instruction followed by an express retraction; and in numerous cases such has been held no error. The latter portions of the act specifically withdrew any prior language thereof which was not applicable to the case on trial.

9. Exception is taken to the following excerpt from the charge of the court: "You could reduce it (the full value of the life of the deceased) to its present cash value, and your verdict should be for such sum as, if put out at interest at seven per cent. per annum, and exhausting a part of the principal each year, would produce each year what you find would be the decedent's yearly earnings, and the entire sum would be exhausted at the end of the decedent's expectancy as you find it. In other words, the amount found, with the addition of seven per cent. legal interest, would accomplish exactly such payments each year throughout the decedent's expectancy as you find he would have earned during that expectancy and would be exhausted at the end of his expectancy." This is alleged to be error for the reason that the jury not merely *could,* but under the law were *required* to, reduce the value of the life to a present value; that it gave to the jury a standard of calculation which the law does not authorize, and which would require the finding of too large a sum, and one which was impossible of application by the jury or anyone else not pos-

sessed of a knowledge of higher mathematics, if at all; that it was misleading and confusing when taken in connection with the charge give upon the use of the annuity and mortality tables, in that it was based upon a standard of calculation entirely different from that required by the use of such tables as these were defined by the court; that it was impossible of application  in that the court instructed the jury that they should allow such sum as would produce annually the amount of the decedent's yearly earnings, and at the same time such sum as would be exhausted at the end of the decedent's expectancy. The charge will be repeated with its immediate context, in order that its import may be correctly understood. The court had charged that if the defendant was found to be liable, the measure of damages to be recovered should be the full value of the life of the deceased as shown by the evidence, without reduction for necessary or other personal expenses of the deceased had he lived (Civil Code of 1910, § 4425), less such deductions as should be made in accordance with other instructions if the death of the decedent was attributable in part to his own negligence, not amounting to a failure to exercise ordinary care. The court then proceeded as follows: "In estimating the amount of damages, if any, to be allowed in such case, the jury should consider all the facts and circumstances, the health of the decedent, his occupation, his earning capacity, his probable expectancy of life, as provided by the statute of Georgia. You can consider his expectancy of life, and you can consider his earnings at the time of his death, and what you find to be his future earnings, but you would not be authorized to find the gross value of his life; that is, you could not add together the amounts which he would earn, year by year throughout his entire expectancy, and find that. On the contrary, you would have to reduce whatever amount should be found to be his future earnings throughout what you find his expectancy to be, to its present cash value, and you would have to do this upon the basis that money is worth seven per cent. per annum. In other words, on this seven per cent. discount basis you could reduce it to its present value, and your verdict should be for such a sum as, if put out at interest at seven per cent. per annum, and exhausting a part of the principal each year, would produce each year what you find would be the decedent's yearly earnings, and the entire sum

would be exhausted at the end of decedent's expectancy, as you find it. In other words, the amount found, with the addition of seven per cent. legal interest, would accomplish exactly such payments each year throughout the decedent's expectancy, and would be exhausted at the end of his expectancy." Immediately following the charge quoted the jury were properly instructed as to the manner in which they might use the annuity and mortality tables admitted in evidence.

The charge was not error upon the ground that the jury were left with the option to reduce the value of the life to its present cash value or not as they might choose, for, as will be seen from the entire charge upon the subject, they were told, " You would have to reduce," and " You would have to do this upon the basis," etc.; again as shown in the excerpt, " Your verdict should be for such sum as if put at interest," etc. If the charge was impossible of application, then we should presume it was not applied and could neither help nor hurt either party to the case. The charge suggested by the Supreme Court in *Florida &c. R. Co.* v. *Burney,* 98 *Ga.* 1 (26 S. E. 730), on the correct manner of applying the mortality and annuity tables has been followed in very many cases, and has been held to be good as against a similar exception (*Southern Ry. Co.* v. *Scott,* 128 *Ga.* 244 (2), 57 S. E. 504), and we think that the same may be held as to the charge now reviewed.

We doubt if any correct statement of the law would be error merely because of being hard to understand; but let us determine if this charge was inherently erroneous. It unquestionably conforms in substance with the principle announced by the Supreme Court in *Atlanta & West Point R. Co.* v. *Newton,* 85 *Ga.* 517 (4), 529 (11 S. E. 776). The only difference suggested by the counsel for the plaintiff in error is that in the *Newton* case the principal was applied to the net earnings of the decedent. It was in the charge now in question applied to the full value of the life of the decedent, without reduction for the value of expenses. This difference arises by reason of the act of 1887, by which deductions for the expenses of the decedent are not allowed in determining the full value of his life. The *Newton* case was governed by the law as it existed prior to that act. In that case the court said: " The jury should have given her a sum that would be exhausted at the end of twelve years by expending each year an amount equal

to the net annual earnings of the husband. Such would be the full value of his life. This death occurred before the act of 1887, which forbids any deduction for the husband's expenses. Of course the gross annual earnings will be the measure in cases falling under this act." The charge is fully in accord with the principle of annuities. In determining the present cash value of a life upon the basis of the yearly earnings for the period of expectancy it is not proper to find the gross sum and reduce it to its present value by the principle which would apply if the gross sum were to be payable only at the end of such period. In the latter case the present value would be arrived at by dividing the gross sum by one dollar, plus the legal interest, seven per cent. per annum, for the period of the expectancy. Such a method was applied by the trial courts in the cases of *Standard Oil Co.* v. *Reagan,* 15 *Ga. App.* 571 (5), (6) (84 S. E. 69), and *Williams* v. *McCranie,* 27 *Ga. App.* 693 (4) (109 S. E. 699); and while the instructions given in both of these cases were approved, the affirmances resulted because there was no error as against the defendants therein. The instructions which were under review in those cases were more favorable to the defendants than the law required. If the plaintiff in either had recovered some amount with which he was dissatisfied, and thereupon had excepted to such instructions, a different ruling might have been made. This is so for the reason that the instructions directed the calculation of the present value upon the basis of a gross sum payable all in a lump at the end of the expectancy, thus omitting altogether a consideration of the fact that the earnings of the decedent would have been enjoyed in annual installments. Necessarily it would require a larger sum paid down in spot cash to produce at interest the equivalent of the value of the life, when a part of the principal is to be used each year, than would be the case if none of the principal were withdrawn until the end of the expectancy. The accumulation of interest in the latter case would be larger, and therefore the original principal should be less.

We may demonstrate by an example that the charge here complained of is in line with the theory of annuities: Let us suppose that a decedent, for the loss of whose life damages were sued for, had an expectancy of 20 years; that his earning capacity was $1,000 yearly. The gross value of his life would be $20,000. The

beneficiaries, however, were enjoying his earnings each year. We cannot imagine any bank paying as much as seven per cent. interest on money, yet we will violently assume it for the convenience of the illustration. We will say that such a sum is to be recovered and paid immediately as will provide $1,000 a year for the space of 20 years. This sum should be such that, if put in a bank at seven per cent. interest, $1,000 could be drawn annually therefrom throughout the whole period, with none whatever remaining at the end. This is substantially what was charged in this case. It is exactly what is intended to be accomplished by the use of the mortality and annuity tables.

The instruction excepted to, if originally hard to understand, was followed by the instruction on the use of the tables, by which the calculation was easy to be made, and by which the general principle previously stated was concretely applied.

The charge which we are considering is, therefore, perfectly correct in principle. It might have been more specific in regard to the part to be exhausted each year. The part to be annually exhausted would be, as a matter of course, the equivalent of the yearly earnings of the decedent. No exception, however, is taken upon this ground. Moreover, we are not intending to say that such exception, if made, would have been good. We are satisfied that the charge is not subject to any of the general assignments made thereon.

10. It cannot be adjudged that there was an abuse of discretion by the trial court in overruling the motion for a new trial.

*Judgment affirmed. Jenkins, P. J., and Stephens, J., concur.*