29950. CONTINENTAL CASUALTY COMPANY *et al. v.* BENNETT.

DECIDED JULY 16, 1943.

*Hitch, Morris & Harrison,* for plaintiff in error.
*Oliver, Oliver & Davis,* contra.

PER CURIAM. Dock Bennett filed a claim with the Industrial Board against Artley Company and Espy Paving & Construction Company, as employer, and Continental Casualty Company, as the insurance carrier, to recover compensation for the loss of sight in his left eye. The hearing director made an award in favor of the claimant, the full board affirmed the award, and the judge of the superior court sustained that finding. The latter judgment is assigned as error on the ground that the award was contrary to law in that there was not sufficient competent evidence to authorize it.

"The finding upon the issues of fact by the commission is conclusive as to those issues in the reviewing court, if there is any evidence to sustain it." *Georgia Casualty Co.* v. *Martin,* 157 *Ga.* 909, 915 (122 S. E. 881). See also *United States Fidelity &c Co.* v. *Christian,* 35 *Ga. App.* 326 (3) (133 S. E. 639). There is suf-

ficient evidence to sustain the finding of the commission. The superior court did not err in sustaining the award.

This court must accept that evidence most favorable to sustain the award in question. Under this record it may be, and is conceded, that an award denying compensation might be affirmed, but that is not the question before us. The question is, under the facts of this case, and under the circumstances of the case as shown in the record, is there any evidence to sustain the award made? Let us then examine the record from this viewpoint.

The claimant, testifying in his own behalf: "Q. Did anything happen to you on or about May 8, 1941, while you were on the job? A. Yes, sir. Q. Tell the judge about it. A. I stuck a little plank in my eye. The foreman told me to saw off part of it and I had it in my hand and I was in a hurry and I reached down to the floor and picked up the saw and the end of it went in my eye. Q. What happened to your eye when the piece of wood stuck in it? A. Blood shot all over. Q. Were you treated by Dr. de-Caradeuc? A. Yes, sir. Q. For how many days? A. He treated me every day, Thursday, Friday, Saturday and Sunday and he told me Sunday I could go back to work on Monday. He give me some medicine to go in my eye and told me to put it in there for two weeks and I did. . . Q. The trouble in your eye, did it or did it not seem to you to have cleared up? A. Yes, sir, in about four or five weeks after I went back to work it kind of cleared up, and I thought my eye was all right but in about five or six weeks after then I went blind. . . Q. That was in which eye? A. The left eye. Q. Can you fix it by the month, was it or not the latter part of July or early part of August that you went blind? A. It was in July. Q. You testified you discovered one morning that you couldn't see and that night on the street you tried to see an electric light and couldn't see it. Was there any pain in connection with the loss of vision? A. Yes, sir, it kept feeling like a skim over my eye all the time. I kept wiping it and trying to see out of it all the time. . . Q. And you recall when he operated? A. The 3rd day of September. Q. Of 1941? A. Yes, sir. . . Q. Have you any sight in the eye now? A. No, sir. Q. Until this injury on or about May 8th of last year, what was your general health? A. Good. Q. What was the condition of your eyes? A. Good. Q. Ever had any trouble with

them before? A. No, sir. Q. Never at any time? A. No, sir. Never had to put on glasses. Q. Had you been treated by doctors for any kind of illness in recent years? A. Not since I was a boy. I had typhoid fever one time. Q. And since that time your health has been so good you haven't needed any doctor at all? A. No, sir. Q. You have had no trouble with your eye prior to this injury by accident? A. No, sir. Q. And following that the sight has gone? A. Yes, sir. Q. The Company sent you to the doctor? A. Yes, sir. Q. And that was Dr. Holton? A. Yes, sir. Q. Dr. Holton told you he was not an eye specialist and would have to send you to an eye specialist? A. Yes, sir. Q. And he sent you to Dr. deCaradeuc? A. Yes, sir. . . Q. You returned to work on Monday, I believe, which was four days after the accident? A. Yes, sir. Q. Did you get along all right in your work? A. Yes, sir. Q. You continued the drops for the two weeks after the accident? A. Yes, sir. . . Q. Could you see all right out of your eye after you had used the drops for the two weeks? A. I couldn't see as good, I could see a little. . . Q. What treatment did Dr. Rosen give you? A. He examined my eye and said I had a lot of blood in my eyeball, and give me some medicine to take, and he give me some to put in my eye. . . Q. Did you use the medicine? A. Yes, sir. Q. Did you get any relief? A. No, sir. Q. How long were you under Dr. Rosen's treatment? A. Two weeks. Q. And then you returned to Dr. deCaradeuc? A. Yes, sir. Q. And what treatment did Dr. deCaradeuc give you? A. He put them drops in my eye. Q. And how long did you go to Dr. deCaradeuc for treatment? A. Right about a week and the last time I went to him he told me that the insurance company was not going to take care of me any longer and he told me he wanted to see me again but I didn't go back any more, I got so bad off I just went on to Dr. Lang and it wasn't long before he got me out of my pain. I was suffering a lot of pain. . ."

Dr. Lang, a witness for claimant, testified in part as follows: "Q. What is glaucoma? A. Glaucoma is increased pressure in the eyeball which takes several different forms, acute type or simple glaucoma that has very little pressure but gradually snuffs out the sight unless the pressure is relieved. Q. Does glaucoma arise from trauma? A. Yes, sir. . . Q. In your opinion, doctor,

could the accident concerning which you just heard him testify to and which he gave you in his history, could that accident have been the cause of the loss of vision? A. Now, the accident apparently was rather trivial, because at the end of four days he returned to work and although it is possible for a trivial accident to have resulted in a secondary trouble, it is not probable. Q. Irido-cyclitis is a rather mysterious trouble? A. 'Mysterious'? Q. By 'mysterious' I mean they are diseases that the medical profession has not fully found out all about the predisposing causes? A. Some phases of glaucoma, the etiology of glaucoma, is still somewhat of a mystery; we know glaucoma is increased pressure in the eyeball, but we frequently can't find a reason for it in some cases. . . Q. And, not having seen him until the late time you did, you can not, of course, state positively whether or not the accident brought on the loss of vision? A. No, sir. Q. But it is your testimony that it could have? A. That is a possibility. I would rather put it that way. . . Q. Doctor, medical men differ, do they not, occasionally, as to what one would consider a severe injury or a trivial injury? Is there a range in there where the human element comes in, what one man considers trivial and another man might consider more severe? A. The human factor enters into it. . . Q. If a patient came into your office and told you that he had received an injury to his eye, could you, by an examination of the eye, determine whether or not that would develop into an iritis? A. How soon after the receipt of the injury does the patient show up? Q. Say immediately after the injury you examine the eye, could you tell from an examination of the eye whether or not the injury was severe enough to produce later an iritis or an irido-cyclitis? A. No, sir. Q. You could not? A. No, sir. . . Q. Can you answer it, doctor, on the same basis as propounded with the additional assumption that he had good cause for using the drops two weeks beyond his discharge under the direction of this physician? A. If he had good cause to use drops for two weeks after his physician had discharged him it would indicate one of two things, either the man did continue to have trouble or the man just desired to use the treatment. Well, if the man did continue to have trouble for two weeks after being discharged by the doctor although he was conscious of trouble and was treating himself for it makes the sequence of things that did

happen more probable than it would if the man had been discharged and had no further evidence of trouble whatsoever in the time elapsed. Q. Let's take that four or five paragraph question there and change it just a little, the question as stated with this addition: The first eye specialist discharges him after three or four days, prescribed drops for him to put into his eye which he does for two weeks. The medicine is exhausted. It is an additional two or three weeks thereafter before the inflammation and trouble in the eye, in the opinion of the patient, completely clears, then under these circumstances would the probability of the original trauma bringing on the trouble and causing the loss of vision be greater than if the eye had been completely well at the end of four or five days? A. Yes, sir, possibly would be more, would be a bigger factor."

L. R. Aiken, a witness for the claimant, testified, that he had worked on the same job with the claimant, and had known him for thirty years; had never known him to lose any time from work because of illness; had not known him to complain of any trouble with his eyes, and that his eyes were apparently good.

Dr. deCaradeuc, a witness for the defendant, testified, in part: "Q. Did you prescribe any additional treatment for him after you discharged him? A. No, sir, I didn't, I may have told him to keep up the drops for a couple of days and stop, but I didn't prescribe it as a regular treatment from then on for any length of time. I may have just said 'keep up the drops for a couple of days and then stop.' Q. So when you saw him on May 11th the corneal abrasion was clear? A. Yes, sir. Q. But the hemorrhage was not clear? A. Not entirely clear, no, sir. Q. And would that perhaps have been your reason or a reason for suggesting that he continue the application of the drops? A. It may have been a reason why he kept it up, yes, sir."

Dr. Chisholm, a witness for the defendant, testified: "Q. Why not longer? A. Because the epithelium heals over and the patient goes to work. With the corneal abrasion that is not healed, the symptoms are so pronounced that the patient will not go to work, they have a red eye. Q. A corneal abrasion could develop into an iritis, could it not? A. In due course of time, yes, sir. . . Q. Doctor, was it your testimony that irido-cyclitis, the most frequent cause of it would be toxemia? A. Yes, sir. Q. And then trauma? A. Yes, sir."

Such, in part, is evidence favorable to the claimant which is sufficient to sustain the award.

After the claimant closed his case, the defendant (plaintiff in error here) introduced expert medical testimony for the purpose of nullifying or rebutting the case of the claimant as made out by the evidence above set forth, as well as testimony concerning two Wassermann tests made on the claimant after the injury was received. One of these tests was made August 9, 1941, which showed negative, and the other November 26, 1941, which showed positive. The positive test showed "4 plus, with 40 units." Dr. Howard testified as to these tests: "Q. Do you not sometimes get a false Wassermann reaction? A. Oh, yes, sir, but they are usually weak reactions. Q. Would it not have been a better way to determine what the man's blood showed if there had been a series of Wassermanns rather than simply one? A. Where there is a conflict of reports, when one man in the laboratory claims negative and the other positive that is the usual procedure, to take a series to try to determine who is right. Q. From your report could you tell whether this syphilis had been contracted recently or sometime before or could you tell? A. It would not be possible to tell unless it was in a secondary stage, that is, from the blood itself." It appears that the finding of a single director which was approved by the full board disposes of syphilis as a factor in our consideration. The director found: "I cannot say much on the subject of the disease of syphilis as injected into this case, and I do not believe from the evidence that it had any material part in this case."

In passing, it might be assumed that when the claimant completed his testimony able counsel for defendant were convinced that the claimant had made out a case else they would have introduced no testimony. Other than the testimony regarding the tests above referred to, the testimony for the defendant was in the main expert medical testimony, a great deal of which was based on hypothetical questions. As to expert testimony, the rule is well expressed in *Blanchard* v. *Savannah River Lumber Co.,* 40 *Ga. App.* 416, 424 (149 S. E. 793): "While competent expert testimony is entitled to great weight, it is not so authoritative that either court, jury, or commission is bound to be governed by it, since it is advisory merely and intended to assist them in coming to a correct conclusion. Consequently courts, juries, and commissions, in determining the

issues they are called upon to settle, may and should take into consideration all the surrounding facts and circumstances attending the subject-matter of the inquiry." The Supreme Court states the rule in *Manley* v. *State,* 166 *Ga.* 563, 566 (19) (144 S. E. 170). "The opinion of an expert witness is not conclusive upon the jury: Such testimony is intended to aid them in coming to a correct conclusion upon the subject; but the jury is not bound by such opinion, and can disregard it." "Negative evidence is only a species of circumstantial evidence." *Georgia Railroad & Banking Co.* v. *Wallis,* 29 *Ga. App.* 706, 714 (116 S. E. 883). We might add that positive evidence is only a species of direct evidence. Black's Law Dictionary, "Evidence", note, p. 448. There are various classifications of evidence. Code, § 38-102, provides: "Direct evidence is that which immediately points to the question at issue. Indirect or circumstantial evidence is that which only tends to establish the issue by proof of various facts, sustaining by their consistency the hypothesis claimed. Presumptive evidence consists of inferences drawn by human experience from the connection of cause and effect, and observations of human conduct." Therefore, applying these rules of evidence to the facts of the instant case, this court is without authority to disturb the award.

While it is true that the single director stated: "The difficult question in the case is the determination of the cause of the blindness. Neither side was able to present *positive* evidence on this question." (Italics ours). We know of no rule of law which requires the claimant to make out his case by positive testimony before he is entitled to an award in his favor. The true rule is, as stated above, that the commission *"may and should take into consideration all the surrounding facts and circumstances attending the subject-matter of the inquiry."* (Italics ours).

As a brief summary, the facts and circumstances as revealed by the record show that this claimant, without any previous material impairment of his general health or vision, was injured in his eye on May 8, 1941, by a blow with a plank. He immediately went to the defendant's doctor, a general practitioner, who directed him to an eye specialist. The specialist treated him from May 8, to May 12, 1941, and prescribed treatment for two weeks thereafter. About four weeks after the injury he went to another doctor, who treated the eye for about a week. Then he returned to the first

eye specialist, who again treated him for an additional week. After this he went to another eye specialist and an operation was performed which relieved the pain, but which did not restore the sight which was completely lost before the operation. The claimant testified that from the time of the injury until the loss of sight there were interims of two weeks or more when no specialist saw him, and one of the specialists testified in effect that from the time a trauma to the eye was inflicted causing an abrasion, glaucoma might have developed therefrom without pain attending certain stages of it. The claimant testified that at no time from the date of the injury to the loss of sight did his eye feel normal; that it felt like there was "a skim over my eye all the time."

In our opinion this evidence is amply sufficient to sustain the award, and the superior court did not err in affirming the award of the commission.

*Judgment affirmed. MacIntyre, J., and Gardner, J., concur. Broyles, C. J., dissents.*

BROYLES, C. J., dissenting. The evidence disclosed the following facts: On Thursday, May 8, 1941, the claimant, while working as a carpenter for his employer, accidentally struck the end of a small plank in his left eye, causing the eye to become bloodshot; his foreman sent him to Dr. Holton, the company's doctor, and Holton sent him to Dr. deCaradeuc, an eye specialist employed by the company; he was treated by the eye specialist on Thursday, May 8, on Friday, May 9, on Saturday, May 10, and on Sunday, May 11; after the treatment on Sunday, the doctor told him he could return to his work the next day; he did return to his work on Monday, May 12, and continued to work until the latter part of July, or the first part of August, 1941, when he suddenly became blind in his left eye. The claimant testified that the eye specialist, when he finished treating him, gave him some drops and told him to put some in his eye for two weeks, that he did so and in four or five weeks his eye "kind of cleared up" and he had no pain in it, and he thought it was all right; that after he became blind in his eye he consulted Dr. Rubin, an eye specialist, who treated him for two weeks, that he then went back to Dr. deCaradeuc who treated him a week; that the eye was giving him severe pain all the time and he finally went to another eye specialist, Dr. Lang, who relieved his pain by operating on the eye on September 3, 1941; that he never recovered his

sight; that up to the time of his accident his general health was good, his sight was all right, and he had never had to wear glasses. He admitted however that some three or four months before the accident he had a slight case of syphilis and received medical treatment therefor; he thought his syphilis was cured before his accident but was never told by any doctor that it was cured. Dr. Lang, a witness for the claimant, testified, in part, that on August 30, 1941, claimant visited him, complaining of severe pain in his eye, he examined him and found that he had irido-cyclitis and glaucoma; that after the eye failed to respond to two days' treatment he performed an iridectomy and relieved him of his pain, but that his sight was irrevocably gone; that glaucoma results from a trauma or from disease; that claimant *might* have lost his sight as a result of the irido-cyclitis, and the glaucoma *may have been* secondary to that; that the accident was apparently trivial because claimant returned to his work in four days and it was *possible but not probable* that such an accident would result in a secondary trouble, or that it would cause glaucoma and irido-cyclitis at the end of several months; that not having seen claimant until some time after the accident he could not say positively whether the accident caused the loss of vision, he could only say that it was a *possibility;* that the accident caused a corneal abrasion to claimant's eye and that such an abrasion is "a little scratch on the cornea," but when the abrasions are deeper "they become ulcers and then you have a problem to deal with;" that a corneal abrasion is a very simple injury, that a cinder in the eye would cause such an abrasion; that a corneal abrasion could not develop into iritis, but the injury that produced the abrasion *might* injure the eye sufficiently to produce iritis; that unless an injury to the eye is pretty serious it is reasonable to assume that anything happening to it several months later could hardly be caused by it, but it would be "barely possible;" that in a simple abrasion "there is no infection, no inflammatory aftermath to amount to anything and it clears;" that if the abrasion is more than a simple one you would expect *an ulcer to develop before the patient has an iritis or any other involvement of the other parts of the* eye. Dr. deCaradeuc, a witness for the defendants, testified, in part, that, on May 8, 1941, he examined the claimant and found a slight abrasion of the cornea of his left eye, that he treated him for four days and then discharged him as completely cured, as all

signs of the injury had cleared up and the abrasion was cured; that he may have given the claimant drops to put in his eye for several days after his discharge but did not remember doing so; he did not see him again until August 23, 1941, when the claimant came to his office and complained of loss of vision and severe pain in his eye, and stated that the pain started about three weeks before August 23; that witness examined the eye and found that all signs of the abrasion of the cornea had disappeared; that a corneal abrasion can not develop into an irido-cyclitis *unless it had some intermediate stages* which could easily be determined by the attending doctor; that a corneal abrasion which completely clears up and disappears can not develop into irido-cyclitis; that irido-cyclitis can be caused from various infections, such as syphilis, bad teeth or tonsils, typhoid fever and influenza; *that there was no connection whatever between the claimant's injury and the subsequent irido-cyclitis.* Dr. Chisholm, a witness for the defendants, testified that he had not examined the claimant. His testimony was purely expert and based upon certain hypothetical questions. He testified, in part, that a corneal abrasion is a very slight injury to the eye, something that you see every day; that he had treated several thousand corneal abrasions and that none of them developed into irido-cyclitis; that toxemia is the most common cause of irido-cyclitis and next to it is trauma; that a subconjunctival hemorrhage is a very minor injury and does not cause irido-cyclitis, there being no connection whatever between them. In answer to a hypothetical question setting forth substantially the material facts of the claimant's injury, his treatment and his subsequent loss of vision, the witness stated that in his opinion there was no connection whatever between the injury of May 8, 1941, and the irido-cyclitis. Both Dr. Chisholm and Dr. deCaradeuc testified *that before a corneal abrasion can develop into irido-cyclitis, it must take the following steps: First, the abrasion, second, an ulcer, third, iritis, and fourth, irido-cyclitis; and that there must not be a break in any of these steps. This testimony was not in conflict with any testimony given by Dr. Lang, the only eye specialist who testified for the claimant.* In fact, Dr. Lang testified in effect *that a corneal abrasion must be followed by an ulcer before irido-cyclitis can develop.*

It is true of course that the finding of a fact by the hearing director is conclusive and binding on this court, where there is *any*

*competent* evidence in the record to sustain the finding. But it is also true that "every finding of fact must have some substantial evidence for its support. It must result from this that a finding of fact made by the commission, can not be based on a mere conjecture any more than can a finding of fact made by a court. It can not be upheld without evidence to support it. Honnold on Workmen's Compensation, 785, § 230." *Lathem* v. *Hartford Accident Co.,* 60 *Ga. App.* 523, 527 (3 S. E. 2d, 916). In the award of the hearing director in the instant case is the following statement: "The difficult question in the case is the determination of the cause of the blindness. Neither side was able to present positive evidence on this question. The claimant himself did not attempt to say and could not have. None of the doctors for either side could say. Therefore, I have been left, under such a state of facts, to determine in positive terms just what the cause was. In these circumstances I can but trust that the conclusion I have reached on the subject speaks the truth."

The real question in the case was whether there was any competent evidence showing that the blindness of the claimant resulted from his accidental injury on May 8, 1941, *and the burden was on the claimant to prove that it did.* This burden he failed to carry, as virtually admitted by the director. The director, in stating that none of the doctors for either side could say what caused the blindness, apparently thought that the defendants had the burden of proving what did cause it. Of course, they had no such burden, but they did show by uncontradicted (uncontradicted on material matters) medical testimony that the claimant's injury was not the cause of the loss of sight in his eye. The *uncontradicted* testimony of the defendants' medical witnesses, *that the corneal abrasion in the eye of the claimant could not have developed into irido-cyclitis, unless an ulcer had developed after the abrasion and before the irido-cyclitis, is in itself sufficient to demand a finding that the claimant's loss of vision was not caused by his accident of May 8, 1941, there being no contention and no proof that an ulcer had so developed in his eye.* Ordinarily, expert medical testimony can be believed or rejected by the hearing director, but in a case like this where the vital question in issue can be solved *only* by such testimony, and where the *material* and *controlling* parts of the testimony are uncontradicted, the testimony should and must be ac-

cepted as stating the truth. In my opinion, the award in favor of the claimant was not authorized by *any competent or satisfactory evidence,* and the judge of the superior court erred in affirming it.