34439. LOCKHEED AIRCRAFT CORP. *et al. v.* MARKS.

DECIDED APRIL 11, 1953—REHEARING DENIED MAY 13, 1953.

*Gambrell, Harlan, Barwick, Russell & Smith, James C. Hill,* for plaintiffs in error.

*Ben T. Beasley, Jr.,* contra.

SUTTON, C. J. Mrs. R. A. Marks applied to the State Board of Workmen's Compensation for a hearing of her claim for death benefits against Lockheed Aircraft Corporation and its insurance carrier, Pacific Indemnity Company, on account of the death of her husband, allegedly the result of an accidental injury arising out of and in the course of her husband's employment. Upon the hearing it was stipulated that R. A. Marks was employed by Lockheed on December 8, 1951, at an average weekly wage of $70; that he was on a scaffold in the Lockheed factory near Marietta, Georgia, on said date, when his tools started rolling back, and he had to jump from the scaffold; that he landed, fracturing both heel bones, and was disabled as a result of these fractures until the date of his death; and that the accident in which Marks' heel bones were fractured arose out of and in the course of his employment.

Mrs. R. A. Marks testified that she was living with her husband as his wife and sole dependent at the time of his death, and this testimony was undisputed.

The medical testimony was taken by deposition and submitted by the defendants. Dr. Joseph H. Boland testified substantially as follows: He is engaged in the practice of orthopedic surgery, and treated R. A. Marks in December, 1951, upon being called by the Medical Department of Lockheed Aircraft Corporation in Marietta. He had Marks sent to Crawford Long Hospital, where X-rays revealed comminuted depressed fractures of both ossa calcis (heel bones). He had Marks' feet placed on pillows and packed in ice bags to lessen the pain and swelling that develops in such fractures. On December 9, the following day, with pentothal anaesthesia, he performed an open reduction on both feet and applied plaster casts. Marks was

given penicillin, post-operative, for five days. The post-operative course was normal. Marks remained in the hospital twelve days; and then the casts were removed, the sutures were removed, and new casts were applied. Marks was discharged in a wheel chair. Dr. Boland did not hear from Marks until January 13, 1952, when Marks telephoned and said his left foot was very painful. The witness had Marks brought to his office by ambulance on that same day, a Sunday, and removed the cast from Marks' left foot. He saw no evidence of infection in the left foot and leg and no swelling. Marks' temperature was normal. Marks complained of severe pain in the toes of his foot but not in his heels. The witness prescribed empirin and codeine, and heard nothing more about Marks until January 16, 1952, when Mrs. Marks called him and said that another doctor had examined her husband, diagnosed the case as pneumonia and advised hospitalization. Dr. Boland would not authorize hospitalization at the defendants' expense on the ground that pneumonia could not be attributed to Marks' injury. At about 1 a.m. on January 17, an interne telephoned him from Grady Hospital and told him that Marks was there, had a temperature of 104, was delirious and showed no evidence of pneumonia, but that Marks had been diagnosed as having cellulitis of the foot with probably a pulmonary embolus. Dr. Boland had Marks transferred to Crawford Long Hospital, where he removed both casts and ordered penicillin. Marks was delirious, and it was necessary to give him a sedative. Marks' temperature was 104 degrees; and Dr. Boland suspected a pulmonary or cerebral hemorrhage. He saw Marks at 9 a.m. on January 17, and his condition was worse. Marks was placed in an oxygen tent, was under the care of special nurses, and was given transfusions. As there was no surgical condition in his line, Dr. Boland transferred Marks to the care of Dr. Henry, an internist. Marks died the next day, January 18, 1952.

Dr. Boland further testified: High temperature and delirium are symptoms of pulmonary or cerebral embolus, and it is possible that a cerebral embolus could have been caused by the immobilization of Marks' feet after the open reduction of the fractures. When he removed the cast from Marks' foot on January 13, he found a small area of irritation on the side of

Marks' foot. He wiped it off and put a little dressing on it. When he next removed the cast early on January 17, there was no abscess or swelling at this point, which he punctured with a needle to ascertain whether there was any infection. "Q. Were you not informed before January 13th that the pain had been more or less continuous in Mr. Marks' leg? A. No, sir. Q. When were you first informed of that fact? Was it on that Sunday morning? A. On the 13th of January; yes, sir." The witness could not account for the extreme pain until he heard from the autopsy. Marks was complaining of pain in his toes but not in his heels when he talked to Dr. Boland over the telephone, and when Marks was brought to Dr. Boland's office, his toes were so tender that one could hardly touch them. Marks' toes were not in any way involved in his previous injury. Any such injury causés swelling of the whole foot, but that had subsided when Marks left the hospital in December and before the casts were changed. He noticed no other swelling in Marks' legs after that time. The forming of blood clots in the areas of the fracture would normally be accompanied by swelling, but he never observed such swelling. The irritation on Marks' left foot was not tender, and was normal where an incision with a dressing upon it has been in a cast.

Dr. G. D. Ayer deposed substantially as follows: He is a pathologist, and, at 9 p.m. on January 18, 1952, two hours and ten minutes after Marks' death, he performed an autopsy to determine the cause of the death. After examining the microscopic sections or slides prepared from tissues removed at the time of the autopsy, he decided that Marks died from the effects of thrombocytic acroangiothrombosis. The chief symptoms of this disease are fever and vague pains throughout the body but mostly in the extremities. The classical terminal course is one with symptoms of involvement of the brain, such as stupor, somnolence, or sometimes by a degree of agitation, but finally somnolence and coma supervene. These symptoms are similar to those of other diseases, and may be produced by cerebral vascular accidents. Thrombocytic acroangiothrombosis attacks small arteries and the small vessels or capillaries immediately beyond the smallest arteries. The first change is a destruction of the wall of the vessel with a slight dilation. In the areas of

dilation, thrombi form which occlude or stop up the opening of the vessels. This results in the virtual death of the affected organ. If any thrombi were formed in the arteries near the fractured heel bones, in order to reach the areas involved in Marks' death, they would have to go through progressively smaller vessels to the veins and by way of the veins to the right side of the heart, then through the progressively smaller vessels of the lungs to the left side of the heart, and from the left side of the heart to the arteries in which the lesions were found. Thrombi so formed in the arterial circulation near the heels could not go through the lungs and show up in arterial circulation leading to other vital organs without causing the patient's death on the way. The veins in Marks' body were dissected, but no venous thrombi were found, and he found no pulmonary embolus. If a part of a person's body is damaged by traumatic injury and immobilized, thrombi may be formed and would be formed if at all in the veins. To pass from the veins to the arteries, such thrombi would have to first pass through the lungs, unless there was a defect in the heart, a passage which would allow the blood to go from one side of the heart to the other without going through the lungs. No such passage was found in Marks' heart. If any thrombi or clots had formed as a result of the injury to Marks' heel bones, they could not have come from the arteries, and should any have escaped into the veins, they could not have gotten into the vessels of the arterial circulation in the various organs in which they were found. He also found small scars within Marks' brain, which were most likely older than three months, although it was an extremely unlikely possibility that they might have been there for only six weeks. All evidence is against trauma of any type playing any part in the disease group to which thrombocytic acroangiothrombosis belongs, and, in his opinion, Marks' injury in no way affected the disease and was absolutely independent of his death. The disease is very unusual, there being only about fifteen to twenty recorded cases. He had examined one other such case occurring in Atlanta. In his opinion, the disease occurred independently of the ulcer on Marks' left foot, which he had noticed. The cause of the disease is not known, as no microorganisms have been recovered from the disease and as no one

has been able to produce the disease experimentally with available experimental animals. In his opinion, the disease is uniformly fatal. He knew that Marks had a previous injury, and his effort had been to explain Marks' death at the time of the autopsy as a normal sequel to that injury, particularly in view of Marks' shocked-like state and cerebral manifestation, leading to the belief that he had an embolus or thrombus. He was surprised to discover, microscopically, what Marks had, because neither he nor the clinicians had suspected that condition. He had thought that it was all part of his ulcer and his previous traumatic condition.

The single director who heard the case found that Marks' injury was the proximate cause of his death, and entered an award of death benefits to the claimant, Marks' widow. On appeal to the full board, and later to the superior court, this award was affirmed. The defendants bring exceptions here to the latter judgment.

It is contended that the claimant failed to show that the accidental injury to her husband was the proximate cause of his death, and that the finding of the board in this respect was unsupported by the evidence. "In order for a death to be compensable to a dependent under the provisions of the Workmen's Compensation Law, it must result instantly from an accident arising out of and in the course of employment, or later result proximately therefrom; and the burden of proof is on the claimant to show that the death so resulted." *Johnson* v. *Fireman's Fund Indemnity Co.*, 79 *Ga. App.* 187 (1) (53 S. E. 2d 204); *Liberty Mutual Ins. Co.* v. *Harden,* 85 *Ga. App.* 830 (2) (70 S. E. 2d 89). Where an employee, after sustaining an accidental injury arising out of and in the course of his employment, is disabled continuously until the time of his death shortly thereafter (*Royal Indemnity Co.* v. *Land,* 45 *Ga. App.* 293, 164 S. E. 492, explaining *U. S. Fidelity &c. Co.* v. *Robinson,* 42 *Ga. App.* 177, 155 S. E. 508; *Dorminy* v. *American Mutual Liability Ins. Co.,* 61 *Ga. App.* 301, 6 S. E. 2d 67; *U. S. Casualty Co.* v. *Kelly,* 78 *Ga. App.* 112, 50 S. E. 2d 238; *Johnson* v. *Fireman's Fund Indemnity Co.,* 79 *Ga. App.* 187, supra), or where expert opinion is submitted to the effect that the injury sustained had some connection with the subsequent death of the employee (*U. S. Cas-*

ualty Co. v. Matthews, 35 Ga. App. 526, 133 S. E. 875; Davis v. Bibb Manufacturing Co., 75 Ga. App. 515, 43 S. E. 2d 780), there is ordinarily a natural and reasonable inference, sufficient to support a finding by the board, that the accidental injury was the proximate cause of the employee's death, in the absence of other than conjectural evidence to the contrary. The case of Woodruff v. American Mutual Liability Ins. Co., 67 Ga. App. 554 (21 S. E. 2d 298) holds that where the employee had been up and around and had gone back to his work for 12 days after his injury, and so had not been continuously disabled from the time of his injury until the time of his death, the expert testimony must show more than a mere possibility of a connection between the injury and the subsequent death to sustain a finding by the board that the death was the result of the injury. But it was stipulated in this case that Marks was disabled from the time of his injury, December 8, 1951, until the time of his death on January 18, 1952, and the evidence further shows that he was confined to either a bed or a wheel chair during this entire period, and that he suffered severe pain in his toes and later ran a high temperature and was delirious before his death. It was therefore inferable that Marks' accidental injury resulted in his death.

Although the medical testimony was to the effect that there is no known connection between a fall, which was hard enough to shatter both heel bones, and the fatal disease of thrombocytic acroangiothrombosis, it was also stated that the cause of this disease is unknown. Then, where the cause of the disease from which the deceased employee died is not known by the medical profession, and where it is not known whether there is any connection between such a fall as Marks sustained and such disease, could not a fact-finding body reasonably and properly conclude from the facts and circumstances of this case, as disclosed by the evidence, that the deceased employee's death was the result of the accidental fall which crushed his heels? We think so. See Continental Casualty Co. v. Bennett, 69 Ga. App. 683, 688 (26 S. E. 2d 682). While it was Dr. Ayer's opinion that Marks' death occurred independently of either his previous injury or the small abscess on his left foot resulting from the injury, such opinion was not binding upon the board, and, as

evidence, it was conjectural in its nature. It was ruled as follows in *Autry* v. *General Motors BOP Assembly Plant*, 85 *Ga. App.* 500 (69 S. E. 2d 697): "A medical expert witness may give his opinion as to the cause of an injury; but where the cause of the injury constitutes the ultimate issue of fact to be determined by the fact-finding tribunal, this opinion is not absolutely binding on such tribunal. To hold otherwise would preclude such tribunal from exercising its proper function. The fact-finding body must take the evidence of the medical expert along with all the other facts and circumstances of the case, and thus determine the ultimate issue."

It is argued by counsel for the plaintiff in error that the expert testimony showed it to be impossible for an embolus formed in the veins around Marks' heels to reach any other part of his body than his lungs, where no embolus was found on autopsy; and that it was thus conclusively shown that the injury to Marks' heel bones had nothing to do with his death. This argument ignores the undisputed diagnosis of Dr. Ayer that Marks died of thrombocytic acroangiothrombosis, which is not the result of the *lodgment* of an embolus, but appears first as a destruction of the walls of the capillaries, causing slight dilation thereof. Thrombi or clots then *form* in the affected areas and stop up the capillaries, causing the virtual death of the organ affected. This evidence does not show conclusively that the injury to Marks' heel bones could have had no causal relation to the disease or condition of which he died through some parts of his system other than the vascular system, or that the impact of the fall from the scaffold, in its effect upon his whole body, could not have precipitated the fatal disease.

The finding of the Board of Workmen's Compensation that the accidental injury sustained on December 8, 1951, was the cause of Marks' death on January 18, 1952, was supported by the evidence, and the judge of the superior court did not err in refusing to set aside the award based on such finding and in denying the defendants' appeal.

*Judgment affirmed. Gardner, P. J., Townsend, Worrill, and Carlisle, JJ., concur. Felton, J., dissents.*

FELTON, J., dissenting. I think the court in this case has gone too far in holding in effect that the board can find, from the

mere facts that an employee sustained an injury arising out of and in the course of employment, and is disabled continuously until the time of his death shortly thereafter, that the accidental injury caused or materially contributed to his death. There is no case in Georgia that so holds, according to my interpretation. There is never a real presumption that an injury causes a death. The decisions mean to me that such an inference may be authorized where the facts of the case show the death to be the natural and reasonable consequence of the injury. I think this court went as far as it could in holding that exertion in heart cases could be held to be contributory to injury or death where the medical testimony showed only a possibility of such fact. *Hartford Accident &c. Co.* v. *Waters,* 87 *Ga. App.* 117 (73 S. E. 2d 70). Such a conclusion is based on the principle that even laymen can have a general knowledge of the facts of life and cause and effect and can apply the rule of reason to facts which can be found to authorize a decision on the weight of probabilities. We do not have such a case here. The burden of proof was on the claimant, as the majority opinion admits, and I do not think that burden was carried. *There was no evidence from the claimant's expert witness that the injury caused the pains and symptoms described. The claimant's physician only testified that the heel injuries could possibly have caused the death but he stated that before he could say they did he would have to know the results of the autopsy. So we see that in this case the claimant did not have opinion evidence to sustain a finding in her favor and she did not have facts and circumstances which would authorize a lay board to find that from their knowledge and experience and the facts of life the injuries caused or contributed to the death.* If it is true that the employer's evidence did not absolutely exclude the hypothesis that the injuries caused or contributed to the death, the claimant still would not be entitled to an award because the facts are at least consistent with the theory that the injuries did not cause or contribute to the death. The liberal construction of the compensation law has not the remotest connection with whether an award is authorized in a case like this. The question is one of proof and deduction only. None of the cases cited in the majority opinion authorizes the conclusion in this case.

In every one of them there was expert opinion or facts such as would have authorized the board to award compensation. None involved a case like this, where even medical science did not know the cause of the disease which produced death. If the ruling in this case is followed, the board in any case can hold in effect under similar facts that the insurance contemplated by the law is life insurance rather than compensation accident insurance.