## 42221. NATIONAL DAIRY PRODUCTS CORPORATION et al. v. DURHAM, Administratrix.

ARGUED SEPTEMBER 8, 1966—DECIDED FEBRUARY 27, 1967—REHEARING DENIED MARCH 16, 1967—

*J. Corbett Peek, Jr., Glenville Haldi,* for appellants.

*Smith, Ringel, Martin & Lowe, Sam F. Lowe, Jr., Meade Burns, Robert W. Beynart,* for appellee.

FELTON, Chief Judge. Our ruling is confined to the sole issue argued in appellants' brief, i. e., whether there was sufficient evidence to authorize the finding that the defendants' negligence caused an acceleration and aggravation of a pre-existing embryonal carcinoma of the left testicle, resulting in the eventually fatal spread of the disease throughout decedent's body.

Supporting this causal relation is various medical evidence, although not uncontroverted or absolutely conclusive. Dr. Edwin McDowell, decedent's personal physician, testified substantially as follows: That a collision such as was alleged would, in his opinion, almost unavoidably put pressure on *all* of the decedent's abdominal and pelvic organs; that such pressure in sufficient degree could possibly release bacteria from a pre-existing infection in one organ and cause its spread within or possibly beyond that organ; that, conceivably, pre-existing infection in the prostate gland could be transmitted down the spermatic cord to the epididymis; that people can have such infections without being aware of them, which was true in the decedent's case; that, in his opinion, the decedent's cancer originated in the left testicle and that it could have spread from

there to other areas of the body both by the lymph channel and the blood stream; that he had originally diagnosed decedent's ailment as epididymitis, as evidenced by a swelling of the epididymis.

Dr. James Lea, Jr. testified substantially as follows: that there exist malignant tumors which lie latent and dormant without particularly growing or spreading, sometimes for years; that epididymitis is an inflammation of the epididymis gland which could be brought on by a blow or pressure, not necessarily applied directly to the scrotum, but also to the lower abdomen, so as to temporarily obstruct from that area the blood or lymphatic supply or venous drainage; that epididymitis due to an *infection* would probably have no effect on a dormant latent embryonal carcinoma in the testicle, but that a *blow* or *pressure* causing epididymitis might conceivably squeeze the tumor cells into circulation and into adjacent areas; that, in his opinion, the collision had not directly caused the decedent's cancer, because, even if trauma could produce cancer, which is disputed, it would take longer to do so than the two or three days after the accident, at which time the evidence of the cancer—the swollen testicle— appeared; that a possibility exists, however, that, if cancerous cells were present at the time, trauma induced by pressure from a seat belt might have led to an inflammatory condition in the testicles, which, .in turn, would lead to release of cancer cells into the local area, and to more distant parts of the body.

The above medical evidence is sufficient to establish the *possibility* of a causal relation, even if it falls short of showing *probability*. The cases requiring affirmative medical evidence of *probability*, such as *Ladson Motor Co. v. Croft,* 212 Ga. 275 (92 SE2d 103); *Savannah River Lumber Co. v. Bush,* 37 Ga. App. 539 (140 SE 899); *Atkinson v. Fairforest Co.,* 90 Ga. App. 425 (83 SE2d 243); *Atlanta Transit Co. v. Knight,* 92 Ga. App. 469 (88 SE2d 738); *Callaway Mills Co. v. Hurley,* 100 Ga. App. 781 (112 SE2d 320) and cit., are distinguishable in that they involved issues of causation which, by the nature of the situation, could be resolved solely by expert medical evidence standing alone, in which cases the evidence must naturally be

based at least on reasonable probability. "It appears to be well settled that medical testimony as to the *possibility* of a causal relation between a given accident or injury and the subsequent death or impaired physical or mental condition of the person injured is not sufficient, *standing alone,* to establish such relation." 135 ALR 517. (Emphasis supplied.) The medical testimony in the present case is not standing alone, however, but is supplemented by other, non-expert evidence. "There are a number of cases which, while apparently admitting that medical evidence showing only a possibility of a causal relation between an accident or injury and subsequent death or physical or mental impairment is not, by itself, sufficient to establish such relation, uphold the view that such evidence, in conjunction with other evidence, non-expert in nature, indicating that such a relation exists, although likewise not sufficient by itself to establish the relation, or in conjunction with admitted or obvious facts and circumstances of the case showing that death or physical disability would naturally and probably result from the injury, is sufficient to establish the causal relation." 135 ALR 516, 532. See also 2 ALR3d 384, 387. The uncontradicted evidence as to the decedent's general health prior to the collision was that it was excellent and that he had had no prior difficulty with his testicles, prostate, urinary tract or kidneys, etc. There was also evidence that, within a day or so after the collision, the decedent's urine was a very dark, rusty, muddy color (which Dr. Lea testified could be evidence of a blow sufficient to have damaged the bladder, which could have resulted from the collision), that he was sore right above the crotch, where his seat belt had been, and that his left testicle was sore, tender and subsequently greatly swollen. It was shown that the decedent underwent a gradual physical decline from the time of the collision until his death, some nine months later. Thus, the medical evidence established that there *must* have been pre-existing, latent, dormant cancer, which could have been activated and spread as a result of the collision and the non-expert testimony established the decedent's apparent good health prior to the collision and the onset of cancer symptoms closely following the collision. The finding that the

collision was the proximate cause of the aggravation and acceleration of decedent's pre-existing, latent, dormant cancer was authorized by the combination of the medical evidence (which was about as positive as it could have been concerning a disease about which there is admittedly so much unknown by the medical profession) and the non-expert evidence, which was consistent with and corroborative of this theory of causation. See *Lockheed Aircraft Corp. v. Marks*, 88 Ga. App. 167 (76 SE2d 507); *Fireman's Fund Indemnity Co. v. Moody*, 100 Ga. App. 690 (112 SE2d 202).

The verdict and judgment were authorized by the evidence and the judgments of the court overruling the motions for new trial and judgment n.o.v. were not error for the contended reason.

*Judgment affirmed. Hall, Pannell, Deen and Quillian, JJ., concur. Bell, P. J., Frankum, P. J., Jordan and Eberhardt, JJ., dissent.*

JORDAN, Judge, dissenting. The dissent in this case is upon the theory that the causal connection between the collision and the decedent's subsequent physical decline and death was entirely too speculative and conjectural to authorize a recovery.

While the majority opinion does not cite the recent Supreme Court case of *Lee v. Augusta Coach Co.*, 223 Ga. 72 (153 SE2d 429), there was feeling among some of the judges of this court that the result reached by the Supreme Court in the *Lee* case bolsters the position of the majority opinion in this case. I cannot agree with this contention because the factual situation in the present case can be distinguished from that in *Lee*.

It was pointed out by Justice Nichols in *Lee* that "The evidence that the deceased was in apparent good health and spirits on the morning of his death when he left home to go fishing was not contradicted, and there was no evidence of any intervening cause of any impairment in his health between such time and the collision. Immediately after the collision he was observed in a dazed condition. This evidence together with the medical testimony as to the cause of death and the opinion testimony as to the probable increase in blood pressure resulting from the collision was sufficient to authorize

the finding that the collision contributed to the death of the plaintiff's husband." There was medical testimony in *Lee* that increased blood pressure resulting from fright or fear could contribute to such a hemorrhage in a person otherwise susceptible to such an attack.

In *Lee* the medical evidence was concerned with the connection between a probable rise in blood pressure resulting from the collision and the hemorrhage which produced death. In this case the medical evidence deals with the possibility of a trauma activating a so-called dormant cancer. I think all would agree, including the medical profession itself, that medical knowledge as to cause and effect of the former ailment is vastly superior to that of the latter. Medical testimony dealing with blood pressure and hemorrhage can enlighten a jury on a somewhat positive basis and remove cause and effect from the realm of speculation. Not so in the field of cancer as shown by the medical testimony given to guide the jury in this case, to wit:

"Well, I am simply saying that a *possibility* exists that *if* cancerous cells were present at the time that trauma induced by pressure from a seat belt *might* have led to an inflammatory condition of the testicles, which, in turn, would lead to release of cancer cells into the local area, and to more distant parts of the body." Use of the words "if," "possibility" and "might" condemns this testimony to the scrap heap of conjecture and could not possibly afford the jury a factual basis on which to conclude a causal effect between the injury received in the collision and the resulting death from cancer.

In my opinion the time element is also an important distinction between the factual situation in *Lee* where death resulted from a brain hemorrhage some six hours after the collision, and here where death resulted from cancer, described as fast growing, some 9 months after the collision.

The majority opinion in this case, realizing the speculative nature of the medical testimony, attempts to bolster it by evidence of the deceased's apparent good health prior to the collision. While there is such evidence, the record also shows that the decedent (1) was hospitalized for two weeks in 1958 due

to infectuous mono-nucleosis, (2) was involved as the driver in a motor vehicle collision in the latter part of 1960, (3) was involved as the driver in a motor vehicle collision in March, 1962, (4) was a passenger in a rear end motor vehicle accident in the summer of 1962, all with no apparent injuries, and (5) shot himself in the leg with a .22 caliber pistol in 1963 some months before the collision from which this suit arose. No doubt the same speculative medical testimony given in this case would apply equally to the above situations excepting alone the time element. While the record is silent as to what part of the leg the bullet entered, the trauma resulting from that wound was perhaps more violent and in as close proximity to the scrotum as the trauma to the stomach area caused by the pressure of the seat belt.

The very vital questions which the jury was called upon to decide were (1) when the cancer developed (2) what caused the cancer to develop, and (3) the connection, if any, between the trauma caused by the collision and the cancer. On these important issues the medical proof by plaintiff's witness is as follows:

"Q. You are not—do you know what caused this cancer? A. No, sir, I don't. Q. Do you know when the cancer developed? A. No, sir, I don't. Q. So, I take it, Doctor, that as a trained medical man you cannot state with any reasonable degree of certainty whether there was any connection between this accident and this man's cancerous condition or not? A. That's correct, I cannot."

This medical testimony left the jury to conjecture and speculation on these vital issues. Instead of guiding the jury to a clear and logical conclusion, it gave no direction at all. "Facts which are consistent with either of two opposing theories prove nothing." *Ladson Motor Co. v. Croft*, 212 Ga. 275, 277, supra. It is universally recognized that verdicts cannot stand upon the nebulous base of conjecture and speculation.

The statement in the majority opinion that the medical evidence "was about as positive as it could have been concerning a disease about which there is admittedly so much unknown by the medical profession" succinctly and accurately points out

the legal problem with which we are faced. Until such time as the medical profession increases its knowledge of this disease to the extent that it can elevate such evidence to the more positive realm of probability, recovery in such cases must be denied. In my opinion the court erred in overruling the defendants' motion for a judgment n.o.v.

I am authorized to state that Presiding Judges Bell and Frankum and Judge Eberhardt concur in this dissent.